843 A.2d 115

**Paul Stephen RIGGINS, Jr.**

v.

**STATE of Maryland.**

**No. 2261, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Feb. 26, 2004.

184

Stacy W. McCormack (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Diane E. Keller (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Panel: JAMES R. EYLER, SONNER, and KENNEY, JJ.

KENNEY, Judge.

On July 20, 2001, appellant, Paul Stephen Riggins, Jr., was convicted by a jury sitting in the Circuit Court for Howard County of the first degree murder of his wife, Nancy Riggins (the "victim"). On November 29, 2001, he was sentenced to life imprisonment. In this appeal, appellant poses three ques-

tions for our review, which we have reordered and reworded slightly:

I. Did the trial court err in not granting a mistrial after a witness made a statement bolstering another witness' reputation for truthfulness?

II. Was there legally sufficient evidence to sustain appellant's conviction for first degree murder absent a body or other physical evidence indicating that a murder occurred?

III. Did the trial court err in refusing to instruct the jury that it could not convict the appellant of murder based solely on statements he made to others absent some corroboration of the *corpus delicti* of the crime?

For the reasons set out below, we shall affirm the decision of the circuit court.

## GENERAL FACTUAL BACKGROUND

### The Case Begins

According to appellant, at approximately 6:00 a.m. on the morning of July 2, 1996, he returned to his home in Howard County after working the night shift as a "yard jockey" at the Patapsco Waste Water Treatment Plant ("PWWTP") in Baltimore City.[1] He noticed that the front door of the house was slightly ajar. At approximately 7:00 a.m., appellant found his five-year-old daughter in her bedroom.[2] The victim was not in the house. Appellant took his daughter to day care, returned home, vacuumed the inside of the minivan, loaned a power washer to his neighbor, informed his neighbor that the victim had left him, and fell asleep for the remainder of the day. Later, a friend watched appellant's daughter so that appellant could go to work.

---

1. A "yard jockey" is charged with loading trucks with waste. The employee would fill an empty truck, "scale" it, "tarp" it, and exchange the full truck with an empty truck.

2. Appellant told others that his daughter came downstairs around 7:00 a.m. and that he sent her upstairs to wake the victim. When the child returned, she said that the victim was not there.

On July 3, 1996, appellant called 911 and reported the victim missing. Despite extensive attempts to locate the victim, including checking all motor vehicle administration records throughout the United States and tracking her name, date of birth, and social security number, the victim was never located. After a four-year investigation by the Howard County Police Department ("HCPD"), appellant was arrested on September 21, 2000, and charged with first degree murder.

### The Discovery of the Ongoing Affair

In 1992, Amy Cole, then a minor,[3] began babysitting appellant's daughter. Subsequently, appellant and Cole began a sexual relationship. According to Cole, she "loved" appellant and he "loved" her. As their relationship progressed, Cole visited appellant's house when his wife was at work, visited appellant at work so that they could spend the evening together,[4] and visited with appellant and the victim when she was not hired to babysit. Appellant introduced Cole to co-workers as his daughter.

Appellant told Cole that he and the victim were "no longer sleeping together, they didn't get along, and that [the victim] was going to leave [him]." At such time, when the victim allegedly left him, appellant wanted Cole to "move in with him and take care of [his daughter] and take care of the house, and [they] would get married."

In 1995, during Cole's first year of college, she began dating another man, which disturbed appellant. The following year, appellant told Cole that the victim planned to move to Pennsylvania and that Cole could move into the house and take care of appellant's daughter.

A few months prior to her disappearance in 1996, the victim had approached appellant, inquiring about his relationship

---

3. Amy Cole was born on September 6, 1977.

4. Donna Voella, appellant's employer, testified that appellant's job was "very low key" and that there was "a lot of free time on that job." Appellant usually worked the 6:00 p.m. to 6:00 a.m. shift.

with Cole. He denied that he and Cole had a relationship. Upset about the suspected affair, the victim told others that she was going to report appellant to the police and divorce him.[5] When he told Cole about that confrontation, appellant stated "that he wanted to kill [the victim]," and that he would either "shoot" or "strangle her" and "put her body in the truck with the waste, and nobody would ever find her."

In June 1996, appellant called his friend Leon Adams and asked him if he could borrow a handgun for a "turkey shoot." Adams suggested that he purchase a gun from a pawn shop. A few days later, appellant contacted Adams and again asked about obtaining a handgun. Appellant also approached Ernest Stovall, Jr. and Christopher Alexander about obtaining a gun.

Brian Waugh, a PWWTP yard jockey who worked with appellant,[6] testified that, sometime in 1996, appellant asked him what was the "best way to get rid of [appellant's friend's] wife." Waugh responded that the friend should "get a divorce." Appellant responded, "[N]o, no, I don't mean like that. Get rid of her, get rid of—dispose of her." Waugh then advised appellant that "a lot of people connected with murder, just can't, can't get away with it." Appellant then asked him "if you put a body in a hole and you put lime in it, would it eat the body?" Appellant also approached Waugh about getting a gun and asked him "if a .22 would kill somebody."

On June 30, 1996, the victim called Cole, and informed her that appellant had told her about their affair. Cole responded that it was a "one-time affair that had happened a couple months ago." After her discussion with the victim, Cole visited appellant at PWWTP, where they discussed the situation. Appellant stated that "he'll take care of it."

---

**5.** Appellant was arrested on February 4, 1997, and pled guilty to sexual child abuse. He was incarcerated in the Howard County Detention Center from November 13, 1997, through December 8, 1998.

**6.** Waugh had been convicted of burglary and, in 1995, was on work release.

### Events occurring from July 1 through July 5, 1996

Upset that she had lied to the victim about the duration of her affair with appellant, Cole called the victim on July 1, 1996, and told her that the affair with appellant had been going on for four years. Later that evening, the victim called Cole back. She told Cole that she planned to inform Cole's mother about the affair, which she did later that evening. Following her conversation with the victim, Cole called appellant and informed him of the victim's intention to report the affair to Cole's mother. Appellant responded, "don't worry about it, [I'll] take care of it," and requested that Cole meet him at 10:00 p.m.

On that same day, the victim informed her fried and co-worker, Margaret Speakes, that, because appellant was having a relationship with Cole, she intended to end the marriage and was going to contact an attorney regarding a divorce.

Appellant reported to work for the shift beginning at 6:00 p.m. on July 1 and ending at 6:00 a.m. on July 2, 1996. When he arrived at work, he asked Brian Waugh to come in early the next day because appellant had to take his daughter to daycare. Appellant stated that he had to make such arrangements because the victim was "fed up with him and she was going to leave him."

At approximately 9:00 p.m., the victim spoke on the phone with Christopher Riggins, appellant's brother. She told him that she planned to leave the house because of the affair between appellant and Cole. Although she stated that she intended to leave appellant, Christopher Riggins testified that it was not in the victim's character to "just leave" and that the victim and her daughter had a "very tight relationship."

At 10:00 p.m., John Mark Thomas,[7] a friend of appellant, spoke on the telephone with the victim. He described her as

---

7. To assist the police, Thomas wore a body wire on three occasions in discussions with appellant about the victim's disappearance. Appellant did not admit that he killed the victim.

being "very upset" and "crying." She stated that she was going to leave appellant and go to Pennsylvania with her daughter.

After getting off from work, Cole "stole" some beer and met appellant at 10:15 p.m. at a local food store. They discussed appellant moving out of his house and whether Cole would go with him.[8] Cole then went home and watched appellant pull down the driveway of his house. Cole remained outside until 12:00 a.m. or 1:00 a.m., talking to her boyfriend, who was living with her at her parents' house.

## July 2

At approximately 10:00 a.m. on July 2, 1996, appellant called Thomas at work and told him that the victim was gone. Because there was no one there to watch his daughter, appellant requested that Thomas come over.

At lunch time, appellant visited Cole at work and told her that when he arrived home from work that morning, his daughter was in bed asleep and that the victim "was gone." Cole did not observe any marks, scratches, or bruises on appellant. According to Cole, appellant was "happy" that the victim was gone. He then stated to Cole that the victim left him a note stating that "she was gone, to watch [their daughter], and she'd never come back." Appellant then asked Cole to move into his home "[a]s soon as possible" and "help take care of [appellant's daughter]."

Thomas arrived at appellant's house at 4:00 p.m. Appellant went to work while Thomas watched appellant's daughter.

## July 3

Appellant called 911 and reported the victim missing. At approximately 9:00 a.m., Howard County Police Officer Karen Johnson arrived at appellant's home. Appellant told the

---

8. On cross-examination, Cole testified that she met appellant at the local food store on June 30, not July 1, 1996. She added that she had informed the police that the meeting had occurred July 1, 1996, and that she had "lied to help cover [up for appellant]."

officer that he had last seen the victim on July 1, 1996, at 8:00 p.m. He did not know she was missing until the morning of July 2, 1996. He informed Officer Johnson that approximately $300, some clothes, and a computer were missing.[9] The victim's car was in the garage and her wedding ring was upstairs.

The officer asked appellant if he had contacted the victim's family or friends or area hospitals. Appellant then contacted the victim's parents in Pennsylvania and a sister in California. Appellant told Officer Johnson that he had waited to report the victim missing because he believed that he had to wait forty-eight hours. He then stated that he was having an affair, that his affair caused tension in the couple's marriage, but that they had planned on working it out.

According to Officer Johnson, appellant "appeared very calm, very normal," and "not too overly concerned." In addition, the officer did not notice any signs of a physical altercation in the house or any marks, cuts, or abrasions on appellant. The officer subsequently contacted cab companies and area hospitals to see if the victim had been admitted as a patient.

Later that day, Cole came to appellant's home to watch his daughter. She did not notice anything missing from the home.[10]

### July 4

Cole told appellant that her father believed appellant had killed the victim. According to her, appellant "laughed" and stated: " '[D]o you think that I would be that dumb to risk my freedom, my daughter, to kill [the victim]. Do you actually think I could do that and get away with it?' "

---

**9.** Cole testified that, while appellant was at work, her friend went to appellant's house and took some computer equipment that Cole had loaned to appellant.

**10.** A week or two later, however, Cole noticed that some of the victim's clothes were missing.

During the afternoon, Corporal Luther Johnson and Detective Pete Wright went to appellant's home for a routine follow-up investigation into the victim's disappearance.[11] Appellant told Corporal Johnson that approximately $2,500 in cash was missing from the house. Appellant also advised the officers that he had spoken with the victim about his affair and that, based on a telephone call from the victim's friend, Mary Hand, he believed that she might have gone to Virginia. Appellant indicated that the last time he had seen the victim was during the morning of July 1, 1996, but that he had spoken to her on the telephone several times that day.

Appellant showed Corporal Johnson around the house mentioning missing items, including money, the victim's fanny pack, medication, shoes, clothes, and suitcases. Appellant cried during part of the interview.

### July 5

Cole and appellant continued to see each other. On July 5, 1996, upon a request of law enforcement officials, Cole agreed to tape telephone conversations with appellant.[12] Later that day, Cole placed a call to appellant in an attempt to obtain information about the victim's disappearance.

On or about July 5, 1996, appellant called John Muzzi, a manager where the victim worked, requesting "any monies that were due [the victim] either by normal pay, vacation pay, [or] any other monies that might be available that would go to [the victim]." Appellant further requested that the victim be placed on sick leave and that her "sick leave pay [be forwarded] to him." Muzzi responded that he could not place the victim on sick leave without documentation from a doctor and that any pay would have to be given to the victim.

---

11. During the investigation into the victim's disappearance, Corporal Johnson was assigned to the Violent Crimes Section of the HCPD.

12. During the investigation, Cole recorded thirteen conversations with appellant.

## The Ongoing Police Investigation

On July 8, 1996, appellant was questioned at the police station. Detective William Walsh, a member of the Criminal Investigations Bureau, had appellant complete the interrogation waiver form and then questioned him about the victim's disappearance. Appellant told Detective Walsh that the last time that he had seen the victim was on July 1, 1996, and that he had called her at 5:00 p.m., 6:00 p.m., and sometime after 6:00 p.m.

Appellant then recited the events of July 2, 1996. In an attempt to locate the victim, appellant called her boss and found out that she did not report to work. Appellant stated that the victim's mother called at 10:00 a.m. and he informed her that the victim was out shopping. Consistent with his earlier story, appellant informed the detective that Mary Hand had mentioned that the victim had talked about going to Virginia. Appellant also informed Detective Walsh that the victim left a handwritten note near the coffee pot, saying "goodbye, take care of [the couple's daughter], I won't be coming back." Appellant stated that "he threw [the note] in the kitchen trash."

Sergeant Charles Jacobs, one of the lead investigators in the case,[13] went door to door throughout the neighborhood talking with neighbors to discover any information about the victim's whereabouts or if they had observed anything suspicious on the night of the victim's disappearance. Flyers were distributed throughout the area, a commercial billboard was leased on southbound Route 1, and the local and national news media aired and wrote stories about the victim's disappearance. In addition, Sergeant Jacobs contacted Brett Kirby, an FBI Special Agent, in an effort to locate the victim through the FBI's databases. Other search techniques included seven searches using K–9 dogs and heat sensing equipment. These

---

**13.** In July 1996, Sergeant Jacobs was a detective assigned to the Violent Crime Section, Criminal Investigations Bureau, HCPD.

efforts produced no evidence and no information concerning the victim's disappearance.

On July 9, 1996, the HCPD obtained and executed a search and seizure warrant for appellant's house and the family vehicles, looking for any "signs of foul play" or "a struggle that may have occurred in the residence." Additionally, the police "search[ed] for documentation, bank records, possibly a note, or anything of that nature to assist [them] in possibly locating the whereabouts" of the victim. During the search, the officers removed vacuum cleaner bags, the victim's hairbrush, and a Rolodex. The cars were towed to the HCPD's crime lab in Ellicott City, Maryland.

A second search and seizure warrant was executed on July 23, 1996, and several shovels and garden tools were seized. Soil samples were taken from the rear of the house. A landfill in York, Pennsylvania, was searched on July 18, 1996.

Despite her ongoing sexual relationship with appellant, Cole continued to cooperate with the HCPD by wearing a body wire. On one occasion, appellant suggested what Cole should say to authorities about her July 1, 1996 conversation with the victim, but appellant "never came out and said that he killed [the victim]." Appellant indicated to Cole that the victim was seeing someone named "Bob" and that "she could have possibly run away with him." He further suggested that the victim could be in Florida or in "drug rehab" in Ohio.[14]

On January 15, 1997, the FBI conducted a third search of appellant's home. A "luminal" scan of the residence was conducted, in which a chemical compound was sprayed "in an effort to locate any trace evidence" that could not be seen "with the naked eye." After the application of the chemical compound, bodily fluids such as blood would glow under certain lighting. Most of the house was scanned, but, because of the toxic nature of the chemical compound, the kitchen and

---

14. In the four years that Cole knew the victim, Cole never observed anything that made her suspect that the victim abused drugs.

living room were not tested. No evidence was discovered in this search.

In 2000, Sergeant Charles Jacobs located David Marshall, a former inmate at the Howard County Detention Center who had been incarcerated when appellant was serving his eighteen-month sentence for sexual child abuse. Marshall was informed that his cooperation was needed in the investigation of the victim's disappearance. The State assisted Marshall in getting a bond review in an unrelated case, and in turn, Marshall promised to testify before a grand jury.

Lieutenant Greg Marshall, who supervised the investigation of the victim's disappearance and was not related to David Marshall, testified that he assisted David Marshall in receiving a bond reduction hearing, gave him approximately $200 to pay bills, and drove him to a halfway house.

On December 7, 2000, the HCPD executed a search and seizure warrant for two PWWTP waste tanks in search of human remains. No evidence was found. On April 25, 2001, based on an alleged statement made by appellant, the Baltimore County Police Department dive team searched an area of the Chesapeake Bay near PWWTP. Again, the search did not yield any evidence.

### The Trial

A fourteen-day trial began July 2, 2001, and ended July 20, 2001. The State called over fifty witnesses, many of whom testified about the days leading up to and following the victim's disappearance, the victim's close relationship with her daughter, and the investigation.

David Marshall was a key witness.[15] He stated that, in April or May 1998,

---

**15.** Marshall acknowledged that he was a drug user and that he had a criminal record. The record indicates that he was incarcerated in the Howard County Detention Center from July 2, 1997, through August 16, 1998.

[appellant] told me that, he told me what happened the night he came home early from work, and he was sitting in the living room in the dark, he had been drinking. And he wanted to confront his wife about her going to the police about her finding out about the baby sitter.

\* \* \*

Well, he said that, that when he, you know, he heard her come in, and she turned the lights on, and he came up behind her. He startled her, because she thought he was at work. And he, you know, said he wanted to talk to her, you know. He wanted to talk to her.

\* \* \*

About the situation with the baby sitter. She had found out that he had an affair with her, and that he, and he didn't want her to go to the police. I don't know if she was, I think she was planning on leaving and taking his daughter with her.

\* \* \*

Well, he said he tried to talk to her, you know, and she wouldn't, she wouldn't listen to him. And, you know, he tried, she just wouldn't listen to him.

\* \* \*

He said he got angry and he, he choked her.

\* \* \*

Well, he told me that—he said, he, like, he zapped out, said he chocked [sic] her. He didn't realize, you know, what he was doing, and he choked her, and he—when he took his hand off her neck she fell down, bumped her head. He went to check her pulse, he didn't feel anything . . . .

* * *

He said, then he said, he told me, he put her, he put her in the trunk. And I got up, and I looked at him, and told him, I didn't want to hear anymore, and I went back to my bunk.

Marshall testified that he did not receive any assistance or help from the State regarding his case, but he had received approximately $200 from Lieutenant Marshall.[16]

John McKenny, an inmate at the Howard County Detention Center from March 12 through April 23, 2001, testified that appellant talked about suing Howard County and receiving a large monetary award. Appellant said that, because he was not supervised at work, he needed McKenny's help in establishing an alibi. Appellant said that he would share some of the money with McKenny if he provided appellant with an alibi. Appellant and McKenny worked out an elaborate story in which they were together from the morning of July 1 through July 2, 1996. McKenny further testified:

Well, at another conversation, he told me that I had asked him where she was, what he did with the body? And he said it's in a place where nobody would ever find it. He don't [sic] have to worry about anybody ever finding it. And I said that must, that must be interesting. And he told me that at work his alibi, his boss, could see him somewhere, wherever he was at in the yard or wherever, driving his truck. His boss was—in visual of his boss. [sic] And when his boss left from where he could see him, he got out of one side of his truck, went to the other side, and took her out and threw her over the wall into the water. His exact words, the bitch became fish food. And I asked him what, asked him what would happen to a body, wouldn't it float or

---

16. During the trial court's instructions to the jury, the court stated:

You may consider the testimony of a witness who testifies for the State as a result of a plea agreement or financial benefit. However, you should consider such testimony with caution, because the testimony may have been influenced by a desire to gain leniency, freedom or a financial benefit by testifying against [appellant].

whatever? Between salt water and the fish eating, to [sic] body would deteriorate, and so would the bones.

\* \* \*

And he also said the skull would be the hardest thing, the last, and the hardest thing to go, but with the current and the tides, it wouldn't be in the same place where it was dropped at.

Tony Ross testified that he had shared a "dormitory" with appellant at the Howard County Detention Center.[17] In response to Ross' questions about the victim, appellant "never gave [him] a yes or no answer," but stated that "she left, and the bitch is never coming back." Appellant later stated to Ross, "if I wanted to kill my wife, think about it, I'd just burn her body." That information was provided to the HCPD without Ross receiving any consideration in his pending criminal case. Ross, a self-admitted drug dealer, said he had been arrested approximately twenty times, had thirteen convictions, and was serving eight years at the Eastern Correction Institute.

Members of the victim's family testified that she "stayed in contact often," that she "always returned calls," that she would "[n]ever" walk out on her daughter, and that no one had been in contact with the victim since her disappearance. Although the victim was close to her family, she did not always share personal information with them.

Cole testified that only days after the victim disappeared, appellant proposed marriage to her and on two separate occasions gave her rings. On the first occasion, appellant gave Cole an engagement ring and a wedding band that had belonged to his former wife, Amaryllis. Appellant took those rings back and gave Cole another engagement ring, which she believed had belonged to the victim. Appellant also planned a honeymoon in Florida. Concerned with how a honeymoon

---

**17.** Ross was incarcerated in the Howard County Detention Center from June 15, 1997, through February 9, 1999.

would be perceived by others, they discussed telling law enforcement officials that he was going to Florida to look for the victim and that Cole was going with him to watch his daughter.

In the weeks after the victim's disappearance, appellant sold the family minivan and asked a co-worker about the length of time required before a family member could place a claim for insurance money.

On July 25, 1996, Sharon Kurinij responded to a classified ad to rent a room at appellant's house.[18] Appellant told Kurinij that the victim had left him, that he had observed her getting into a car with "Bob," that he believed they had gone to Berkeley Springs, West Virginia, and that "she's never coming back." Appellant stated that Kurinij could take whatever she wanted from the victim's wardrobe because he was "going to get rid of it or trash it." Kurinij and her two children moved into appellant's home on July 26, 1996. Later, appellant informed Kurinij that he was going to stop seeing Cole. Cole ceased all contact with appellant on February 17, 1997, the date that the State brought charges against him.

The State rested its case-in-chief on July 18, 2001. Appellant moved for judgment of acquittal, arguing that the evidence was insufficient to convict and that an extrajudicial confession of the accused could not warrant a conviction unless corroborated by independent evidence establishing the *corpus delicti*.[19] Because there was no evidence about what tran-

---

18. According to Cole, appellant rented the rooms in his house in order to make money.

19. In *Ford v. State*, 181 Md. 303, 307, 29 A.2d 833 (1943) (quoting *State v. Guie*, 56 Mont. 485, 492, 186 P. 329 (1919)), the Court of Appeals distinguished a confession from an admission, stating:

"The distinction between a confession and an admission, as applied in criminal law, is not a technical refinement, but based upon the substantive differences of the character of the evidence educed from each. A confession is a direct acknowledgment of guilt on the part of the accused, and, by the very force of the definition, excludes an admission, which, of itself, as applied in criminal law, is a statement by the accused, direct or implied, of facts pertinent to the issue, and

spired on the evening of July 1, 1996, appellant contended that the case was nothing more than an "unexplained disappearance." Appellant's counsel stated: "So even in a light most favorable to the State at this point, the best evidence ... would suggest not premeditated first degree murder, but would suggest only second degree murder."

The trial court responded, in pertinent part:

The Appellate Court said in [*Lemons v. State,* 49 Md.App. 467, 433 A.2d 1179 (1981) ] that it is possible to prove the corpus delicti of a homicide even in the absence of finding a corpse. The other cases that have been mentioned, [*Hurley v. State,* 60 Md.App. 539, 483 A.2d 1298 (1984); *Tu v. State,* 336 Md. 406, 648 A.2d 993 (1994) ] also speak to murder cases where a body is not found. In [*Hricko v. State,* 134 Md.App. 218, 759 A.2d 1107 (2000) ], which is a 2000 case, ... there—the issue there was the toxic agent, succinylcholine, that was ultimately determined to have been used to have killed the victim. And the reason that that case, in my opinion, has some significance, is because in that particular case, the Court said that, even if proof of the death may be circumstantial, so may proof of the cause of death be circumstantial.

The determination then goes on to be whether or not there has been, if you will, enough circumstantial evidence to present. In other words, how circumstantial can circumstantial be before or distinguished from speculation. And if the Court, at this juncture, were to adopt [appellant's] argument, in essence, the Court would be attributing a higher standard of proof to circumstantial than to direct evidence, and that's simply not the state of the law. Supreme Court says that the weight to be given to circumstantial evidence is no less than that to be given to direct or vice

---

tending, in connection with proof of other facts, to prove his guilt, but of itself is insufficient to authorize a conviction."

Assuming that appellant's statement to John McKenny regarding disposal of the victim's body was an admission, his statement to David Marshall, in which he directly acknowledged that he caused the victim's death by choking her, constituted a confession.

versa. And that the finder of fact should take all evidence into account.

The evidence in this case is certainly circumstantial. The family and friends, acquaintances of [the victim] have testified that she was not the type or character of individual who would up and go without any type of note, word, communication and continual communication with her family of origin, as well as her immediate family, particularly her daughter Amanda, how devoted she was to her daughter. Her coworkers at the Giant organization uniformly and consistently state how reliable, punctual, even-tempered, helpful, courteous and cordial she was to everyone. There is, there is nothing to show that she had, other than any medical condition, which was able to be controlled by medication, and even her physician, Dr. Levine, who testified today said that it was a moderate blood pressure, or mild, in one aspect he used, blood pressure condition, and even that was controlled with medication. Defense, on cross examination, elicited testimony from Dr. Levine saying that, well, if you don't take your medication, can't you up and die? Well, the doctor said, there could be the variety and variability of symptoms from absolutely nothing to sudden death. But there is nothing to indicate that the alleged victim ..., had any medical problem that would have shown an immediately [sic] cause of death. There was nothing to show that she was of the type of temperament, mental or emotional state, where she would have committed suicide, either because of her own health, and she wouldn't have left Amanda.

We've also had testimony of [appellant's] interest in killing his wife, to what agency he might be able to use, whether it was by gun, or if he could not stand the sight of blood, by strangulation or suffocation, to indicate, at least from the State's portrayal of the case, that there had been some thinking, some discussion, some planning, some plotting, some premeditation. Further testimony of State's witnesses to indicate that [appellant] indicated that he had done the completed act, and disposed of the body.

For all of these reasons, the Court finds that the State has made a prima facie case, and thereby denies [appellant's] Motion for Judgment of Acquittal as to all counts.

The defense then rested and renewed its motion for judgment of acquittal, which again was denied. The jury convicted appellant of first degree murder.

## DISCUSSION

### I. Witness Bolstering

■ Appellant claims that the trial court erred in allowing Lieutenant Marshall to bolster the credibility of David Marshall, the State's key witness. The State argues that the admissibility of evidence falls within the sound discretion of the trial court and that the court neither erred nor abused its discretion in overruling appellant's objection and denying his motion for a mistrial.

When Lieutenant Marshall was asked on direct examination to describe what inmate David Marshall was told by the State regarding his testimony, the following colloquy occurred between the court and counsel:

[STATE]: Was there an occasion in which you were present at a meeting between Sergeant Jacobs, David Marshall, yourself and representatives of the State's Attorney's Office?

[LIEUTENANT MARSHALL]: Yes.

[STATE]: Can you tell the jury what, what David Marshall's legal status was at that time?

[LIEUTENANT MARSHALL]: His legal status was he was pending charges. He had a shoplifting charge in, in Howard County. And I believe he also had a violation of probation charge. And to my best recollection, I think, that is what his legal status was at the time.

[STATE]: By that point, had he made a statement to, to Sergeant Jacobs?

[LIEUTENANT MARSHALL]: Yes.

[STATE]: Did he ask for a deal?

[LIEUTENANT MARSHALL]: Yes.

[STATE]: Were you present when that was discussed with him?

[LIEUTENANT MARSHALL]: Yes, I was.

[STATE]: And what was he told?

[LIEUTENANT MARSHALL]: He was told he would not be given any deal. **That the only thing we would be able to do for him would be to represent to, to anyone who wanted that knowledge that he offered truthful testimony in a homicide case, and that the State would represent that to anybody.**

[DEFENSE COUNSEL]: Objection.

THE COURT: Basis?

[DEFENSE COUNSEL]: May we approach?

THE COURT: Um-hum.

(Bench conference. [Appellant] present.)

[DEFENSE COUNSEL]: Your Honor, now I am [motioning] for mistrial, instead of [Defense Counsel], in light of the fact he's now saying this guy is truthful—

[STATE]: No, that he had offered—

* * *

[DEFENSE COUNSEL]: That he had offered truthful testimony. Now, he's judge, jury, fact finder and grand jury person all in one. He can (inaudible) and he's vouching now for this gentleman comes in to testify (inaudible) reliability, credibility, veracity in this (inaudible) guy. He's truthful because he just said it.

[STATE]: They have already—first of all, I want to advise the Court that this witness has been taken out of order, in part, because of the defense proper objection that they didn't want Lieutenant Marshall's appearance to be serial in this case. He—they have already, in their cross examination of Sergeant Jacobs, attempted to impeach the credibility of David Marshall, and it was proper of them to do so. Because he, because of the suggestion that he

received benefits from the State, this witness has testimony of, of his own direction [sic] knowledge of, of the discussion of, of benefits to be offered to Mr. Marshall in return for his cooperation. And the lieutenant was merely trying to answer my question to address that issue, which has already been raised by the defense, and which we feel is proper for us to, to raise since we won't be, by their objection and our understanding of the Court's ruling, able to bring Lieutenant Marshall back on future occasions to rehabilitate those State's witnesses who had been in the jail with [appellant], whose credibility will be impeached in this fashion. And Mr. Marshall's credibility has already begun to be impeached.

\* \* \*

[DEFENSE COUNSEL]: It isn't those issues. It really it comes down to a very limited statement that Detective Marshall said—saying—if he said if he had prefaced the word truthful testimony, if he. But he said, had, that he had offered truthful testimony in this case. I just think that's a, ultimately, that's a determination for the fact finder to determine whether or not Detective Marshall or any of the other witnesses are truthful. For this witness to definitively state that he had offered truthful testimony is truly a form of vouching to put the official Howard County Police Department informant on the testimony of David Marshall, and that is the inappropriate comment that is the subject of this objection, Your Honor.

[STATE]: May I suggest a remedy, because I take [Defense Counsel's] point, Your Honor, as, as a valid one. It was not the intention. That's the way it came out. If I can be given a little room to lead, I think I can rectify that and clear that up.

THE COURT: What I was going to ask you was how do you distinguish the difference between what the witness's opinion of the testimony was versus what the actuality of the testimony was in terms of its truthfulness or not?

[DEFENSE COUNSEL]: I think that there should not be an opinion that should be permitted to be elicited from the witness, Your Honor. I think if he comes in and then offers and cooperates fully, consistent with what he said before or something like. I mean there's ways of them to identify that he—I mean I believe that Lieutenant Marshall is of the opinion that it's truthful, which was—

THE COURT: That's what I was getting at.

[DEFENSE COUNSEL]:—which is not appropriate for him to testify as to the truthfulness of any witness's testimony. And, therefore, it would be inappropriate for him to say anything about the—whether it was truthful or not truthful.

THE COURT: Frankly, I received his meaning as—I understand what your point is, but I received his meaning as that was his opinion. So motion for mistrial denied. There's no basis, again. [Emphasis added.]

The trial court directed the State to "clarify" the matter. Accordingly, the State asked Lieutenant Marshall whether "[David Marshall] was told that the only deal that would be offered was that representatives of the State's Attorney's Office would go to any judge, anywhere, anytime to give an account of David Marshall's cooperation, period?" Lieutenant Marshall replied: "Yes, sir."

 In Maryland, "[i]n a jury trial, judging the credibility of witnesses is entrusted solely to the jury, the trier of fact; only the jury determines whether to believe any witnesses, and which witnesses to believe." *Robinson v. State*, 354 Md. 287, 313, 730 A.2d 181 (1999). Witness bolstering is not permitted.

In *Bohnert v. State*, 312 Md. 266, 277–78, 539 A.2d 657 (1988), the Court of Appeals stated:

In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury.... It is ... error for the court to permit to go to the jury a statement, belief, or opinion of

another person to the effect that a witness is telling the truth or lying. [Internal citations omitted.]

\* \* \*

It is the settled law of this State that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law.

*Bohnert* is distinguishable because, in that case, the State obviously sought to bolster the credibility of an allegedly abused child through an "expert" opinion of a social worker that the child had been abused. The social worker's opinion was not based on any objective tests, nor on a review of the medical reports, but rather on the child's statement to her.

In *Conyers v. State*, 354 Md. 132, 153, 729 A.2d 910 (1999), a police officer testified that he was able to verify certain statements made by the defendant's cellmate, relating to inculpatory statements made by the defendant, stating:

Yes, sir. There was a significant number of statements that were made by Mr. Johnson, some factual statements that were made by Mr. Johnson that were not included in the application for statement of charges and/or the affidavit for the search and seizure warrants that myself and my partner obtained. *These statements which I knew upon hearing them from Mr. Johnson to be truthful, and I was able to verify each and every statement that he gave us.* [Emphasis in original.]

The Court of Appeals determined that Conyers' reliance on *Bohnert* was misplaced because the police officer was not offering an opinion about the cellmate's credibility. Rather, the officer was "stating that certain information [that the cellmate] had supplied [the officer] with prior to trial was not contained in Appellant's papers and, because [the officer] was able to confirm that information, [the officer] regarded it as accurate and, therefore, truthful." *Id.* at 154, 729 A.2d 910.

In *Ware v. State*, 360 Md. 650, 759 A.2d 764 (2000), the Court of Appeals considered whether the testimony of a critical witness for the State was admitted in error. The witness testified that he had given certain law enforcement officials truthful information and that they had testified at a hearing in an unrelated case. The Court of Appeals concluded:

> [W]e do not think the testimony was proper. Nevertheless, the form of the evidence reduced its prejudicial impact. Anderson made a self-serving statement to the effect that certain persons not present once affirmed, on an unknown basis, his truthfulness in making the statements he again made at trial. Such a statement, by a witness whose credibility is in question, is far less weighty than the expert testimony in *Bohnert,* and its effect on the jury was likely to be insignificant. Moreover, it is implicit that the police believed Anderson or they would not have gone to bat for him at the hearing on his motion to reduce his sentence. Although error, we hold that the error was harmless beyond a reasonable doubt. We are "satisfied that there is no reasonable possibility that the evidence complained of ... may have contributed to the rendition of the guilty verdict." *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

*Id.* at 679–80, 759 A.2d 764.

Here, the lieutenant's statement regarding David Marshall and "truthful testimony" was offered to explain what consideration the State would give Marshall for his assistance in the case against appellant. The State, as it should with all witnesses, desired and expected Marshall's testimony to be truthful. It was not the intent, nor do we believe the effect, of Lieutenant Marshall's testimony to convey his belief or opinion that David Marshall was a "truthful" witness. Moreover, the issue was clarified by restating the question using the word "cooperation," rather than "truthful."

Reviewing Lieutenant Marshall's testimony in context and the State's rephrasing of the question, we perceive no error or abuse of discretion in the denial of the motion for a mistrial.

Had we found error or abuse of discretion, we would deem the error to be harmless beyond a reasonable doubt because we are satisfied that, in context and as clarified, there was no reasonable possibility that the testimony contributed to the guilty verdict.

## II. Sufficiency of the Evidence

### A. Generally

■ Appellant argues that the State's evidence was legally insufficient to sustain a conviction of first degree murder. Specifically, he contends that, absent a body or some other physical evidence, there was no evidence indicating that the victim was murdered. As stated in his brief, "[i]t is not enough for the State to establish that *if* a crime took place, the defendant committed it; the State must first establish that a crime *did in fact* take place." Appellant further contends that, because "the only evidence establishing that a murder occurred in this case, [was] the testimony of David Marshall" and that testimony was not independently corroborated, "the evidence in this case was simply insufficient to sustain the appellant's conviction for first-degree murder."

■ In reviewing a claim of insufficiency of the evidence, we do not "undertake a review of the record that would amount to, in essence, a retrial of the case." *State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336 (1994). Rather, "we review the evidence in the light most favorable to the State." *Id.* 478, 649 A.2d 336. "[W]e accord deference to the factual findings of the jury and recognize its ability to observe the demeanor of the witnesses and to assess their credibility." *Streater v. State*, 119 Md.App. 267, 275, 704 A.2d 541 (1998), *rev'd on other grounds*, 352 Md. 800, 724 A.2d 111 (1999). So long as we are satisfied that "any rational trier of fact could have found the elements of the crime beyond a reasonable doubt, the appellant's conviction must be upheld." *Cooper v. State*, 128 Md.App. 257, 266, 737 A.2d 613, 617 (1999) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

## B. Corpus Delicti and the Missing Body

We recognized in *Lemons v. State,* 49 Md.App. 467, 486–87, 433 A.2d 1179 (1981), that the State could prove a homicide in the absence of a body, stating:

> In every Maryland case reported thus far involving the corroboration rule in the context of a homicide, the victim's body had been recovered and there was other independent evidence, either direct or circumstantial, to suggest that the death was not the result of accident or suicide. This, of course, does not imply that the inability to produce a body is an insuperable obstacle, in itself, to the obtention and sustention of a murder conviction. This Court, as well as the Court of Appeals, has repeatedly said that the independent evidence of the *corpus delicti* "may be circumstantial in nature when direct evidence is not available." ... Moreover, courts from other jurisdictions that have been confronted with the "missing body" problem have unanimously concluded that the death of the alleged victim need not be evidenced directly by the production of the body. Nevertheless, it is clear from these cases that there must be independent evidence, at least circumstantial in nature, that relates to both elements of the *corpus delicti.* [Internal citations omitted.]

█ In *Hurley v. State,* 60 Md.App. 539, 550–51, 483 A.2d 1298 (1984), we again affirmed a conviction for manslaughter where the victim's body was never discovered. Writing for the Court, Judge Alpert stated:

> Our decision in *Lemons* and here—that failure to recover the victim's body is not fatal to the State's case in a homicide prosecution—is in accord with other states that have addressed a similar situation. As the California Court of Appeals succinctly stated: "The fact that a murderer may successfully dispose of the body of the victim does not entitle him to acquittal. That is one form of success for which society has no reward." We concur with this view and with the admonition espoused by the Appellate Division of New Jersey's Superior Court when it stated that "suc-

cessful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt." [Internal citations omitted.]

*See Tu v. State,* 97 Md.App. 486, 505, 631 A.2d 110 (1993) (affirming the second degree murder conviction when there was no witness to the alleged murder and no body was found), *aff'd,* 336 Md. 406, 648 A.2d 993 (1994). Clearly, a murder conviction is not dependent upon the recovery of the victim's body.

## C. *Corpus Delicti*

### Generally

*Corpus delicti* translates from the Latin as "the body of crime." *Black's Law Dictionary* 346 (7th ed.1999) defines *corpus delicti* as the "fact of a transgression; actus reus." Although its practical significance arises most often, as in this case, in connection with the use of extrajudicial confessions in homicide cases, the concept is applicable to any crime. Generally, *corpus delicti* is the fact of specific loss or injury and the criminal agency of someone. As discussed in more detail below, in Maryland, proof of the *corpus delicti* of a crime does not require evidence that the defendant was the criminal agent.

" 'In a homicide case the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone.' " *Lemons,* 49 Md.App. at 473, 433 A.2d 1179 (quoting *Jones v. State,* 188 Md. 263, 272, 52 A.2d 484 (1947)). The State may establish the *corpus delicti* by either direct or circumstantial evidence. *Lemons,* 49 Md. App. at 486, 433 A.2d 1179. *See Woods v. State,* 315 Md. 591, 616, 556 A.2d 236 (1989); *Pierce v. State,* 227 Md. 221, 226, 175 A.2d 743 (1961). The *corpus delicti* of the crime of murder is ordinarily established through the presence of the victim's body and by direct evidence establishing that death resulted

from criminal activity. Although it is certainly more difficult to establish the *corpus delicti* of homicide when the victim's body is missing, it is not impossible. *See Whittlesey v. State,* 326 Md. 502, 562 n. 11, 606 A.2d 225 (1992) (Bell, J., dissenting).

## D. The Corpus Delicti Rule:
### Corroboration of the Extrajudicial Confession

There was no physical evidence that the victim in this case had been murdered. In addition to the circumstantial evidence and the statement to John McKenny, the State relied heavily on appellant's confession to David Marshall. Appellant argues that his statement was not independently corroborated and was insufficient to support his conviction.

In Maryland, "an extra-judicial confession of guilt by a person accused of crime, uncorroborated by other evidence, is not sufficient to warrant his conviction." *Pierce,* 227 Md. at 225, 175 A.2d 743. *See Warszower v. United States,* 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876 (1941) ("The rule requiring corroboration of confessions protects the administration of the criminal law against errors in convictions based upon untrue confessions alone."); *Bradbury v. State,* 233 Md. 421, 424, 197 A.2d 126 (1964) (stating that "[i]t is, of course, well settled that an extrajudicial confession of guilt by a person accused of crime, unsupported by other evidence, is not sufficient to warrant a conviction."); *see also Black's Law Dictionary* 346 (7th ed.1999) (the *"corpus delicti* rule" "prohibits a prosecutor from proving the [body of the crime] based solely on a defendant's extrajudicial statements").

In *Ballard v. State,* 333 Md. 567, 577, 636 A.2d 474 (1994), the Court of Appeals explained that

[t]he Maryland corroboration requirement, operating in homicide cases as above described, does not require that every element of the consummated crime be independently established. Accordingly, the Court of Special Appeals in *Ball v. State,* 57 Md.App. 338, 470 A.2d 361 (1984), *modified on other grounds sub nom. Wright v. State,* 307 Md. 552,

515 A.2d 1157 (1986), correctly rejected an argument in a felony murder case that there was insufficient corroboration because the only evidence of an attempted robbery was the statement of the appellant. "The requirement that there be some corroborating evidence tending to establish the *corpus delicti* generally, does not establish an independent corroboration requirement as to each component element of the *corpus delicti.*" 57 Md.App. at 351, 470 A.2d at 368....

The Court of Appeals also explained that 1 *McCormick on Evidence* § 145 at 557–59 (Strong 4th ed.1992) "provided a national overview of the corroboration requirement," stating:

"The traditional formulation of the requirement, still applied by most jurisdictions, demands that there be some evidence other than the confession that tends to establish the *corpus delicti*....

There is some dispute regarding the definition of *corpus delicti*, which literally means the 'body of the crime.' To establish guilt in a criminal case, the prosecution must ordinarily show that (a) the injury or harm constituting the crime occurred; (b) this injury or harm was done in a criminal manner; and (c) the defendant was the person who inflicted the injury or harm. Wigmore maintains that *corpus delicti* means only the first of these, that is, "the fact of the specific loss or injury sustained," and does not require proof that this was occasioned by anyone's criminal agency...."

Most courts, however, define *corpus delicti* as involving both (a) and (b). This means that the corroborating evidence must tend to show the harm or injury and that it was occasioned by criminal activity. It need not, however, in any manner tend to show that the defendant was the guilty party. Thus in a homicide case, the *corpus delicti* consists of proof that the victim died and that the death was caused by a criminal act, but it need not tend to connect the defendant on trial with that act.

The traditional approach has been to require that the elements of the offense be carefully distinguished and that

the corroborating evidence tend to show each of those elements. A growing number of courts, however, are abandoning the strict requirement that the corroborating evidence tend to prove all elements of the *corpus delicti.* Thus the corroborating evidence need only tend to show the 'major' or 'essential' harm involved in the offense charged and not all of the elements technically distinguished. This tendency is most pronounced in homicide cases, where defendants are often tried for offenses that involve requirements beyond simply the causing of death in a criminal manner. . . ."

*Ballard,* 333 Md. at 577–78, 636 A.2d 474. The Court of Appeals concluded:

> *Further, McCormick points out that "[a] growing number of courts" do not require "that the corroborating evidence tend to prove all elements of the corpus delicti," but only the major or essential harm involved in the charged offense. Id. at 558. That is the rule applied by the Court of Special Appeals in Ball which we now approve.*[20]

*Id.* at 578, 636 A.2d 474 (emphasis added).

### The Circumstantial Evidence

■ Notwithstanding the absence of physical evidence in this case to establish the *corpus delicti* of the crime, the circumstantial evidence established that: the victim was close to her family, most especially her daughter; the victim had not been heard from in five years, despite an exhaustive record and document search in addition to national media awareness of the disappearance; the victim was aware of

---

**20.** In *Ballard,* 333 Md. at 579, 636 A.2d 474, the appellant argued that in *State v. Parker,* 315 N.C. 222, 235, 337 S.E.2d 487 (1985), the Supreme Court of North Carolina had recently announced that it "need not adhere to [its] strict rule requiring independent proof of the *corpus delicti,*" and that it had adopted the trustworthiness rule. Ballard suggested that the Court of Appeals could have or should have applied the same approach. The Court of Appeals said that it would not consider a trustworthiness rule in *Ballard* because, "even if it were to be applied in some fashion, it would not alter the result." *Ballard,* 333 Md. at 579, 636 A.2d 474.

appellant's ongoing affair with Cole; the victim had stated that she was going to report the affair to the police; the victim was going to leave appellant; prior to the victim's disappearance, appellant had asked co-workers about killing a person and disposing of the body; appellant had asked friends about obtaining a gun; appellant had stated to Cole that "he wanted to kill [the victim]," stating that he would either "shoot" or "strangle her," and "put her body in the truck with the waste," where "nobody would ever find her"; appellant stated that the victim "wasn't coming back"; and appellant had conspired to fabricate an alibi. Moreover, on the night of the victim's disappearance, the evidence indicated that appellant left work early to meet with Cole. Cole then observed appellant go to his house. There was clearly sufficient independent evidence that the victim had been murdered to corroborate appellant's confession to David Marshall. Therefore, the confession could be considered, by the trier of fact, along with all of the other evidence, in determining whether appellant was guilty of the crime of first degree murder. It is sufficient that the proof of the *corpus delicti,* even if " 'small in amount, . . ., when considered with the confession, convinces the jury beyond a reasonable doubt of the guilt of the accused.' " *Ballard,* 333 Md. at 575, 636 A.2d 474 (citations omitted).

Appellant argues that the confession to David Marshall demonstrates a lack of premeditation, permitting only a conviction for second degree murder. We do not agree. There was sufficient circumstantial evidence to support a reasonable inference that he had contemplated killing the victim prior to the events of the night of July 1 and the morning of July 2, 1996, and that, after leaving Cole, he went to his house to kill her, that was how he would "take care of" the situation that had escalated to crisis proportions. The evidence was legally sufficient to support the conviction for first degree murder.

### The Circumstantial Evidence Alone

Moreover, in *Morgan v. State,* 134 Md.App. 113, 124, 759 A.2d 306 (2000), we said:

The evidence to support a finding of guilt of the crime of murder may be either direct or circumstantial and, where legally sufficient evidence of *corpus delicti* and criminal agency are presented, the question of whether a defendant is guilty is a question of fact to be determined by the jury. Circumstantial evidence may support a conviction when the circumstances, taken together, do not require the trier of fact to resort to speculation or mere conjecture." [Internal citations omitted.]

In other words, if a conviction is to be supported on circumstantial evidence, that evidence "must be such that, in conjunction with weighing the evidence and assessing the credibility of the witnesses, there are sufficient strands interconnected to establish criminal agency and *corpus delicti* beyond a reasonable doubt." *Id.* at 127, 759 A.2d 306. Even in the absence of the statements to David Marshall and John McKenny, we are satisfied that the circumstantial evidence in this case would have permitted a rational trier of fact to determine, beyond a reasonable doubt, that appellant committed the crime of first degree murder.

### III. The Jury Instruction Request

### A. The Arguments

Appellant argues that the trial court erred in refusing to instruct the jury that statements made by appellant must be corroborated by independent evidence establishing the *corpus delicti* of the crime before they can be considered in determining appellant's guilt. More specifically, appellant asserts that it is a "function of the fact finder, and not the trial court," to determine whether independent evidence of the *corpus delicti* exists. Appellant analogizes to accomplice testimony and the instruction to the jury that they "must first decide whether the testimony of [the accomplice] was corroborated." Maryland Criminal Pattern Jury Instruction 3:11A, at 50 ("MPJI–Cr").[21]

---

21. MPJI–Cr 3:11A provides:

The State responds that the trial court did not err when it rejected appellant's jury instruction because the request for a proposed instruction misstated the law; that no instruction was required because "the existence of corroboration is a legal determination to be made by the court on motion for judgment of acquittal;" and, that, even if an instruction is appropriate in certain cases, the evidence in this case, absent appellant's confession, was "fully sufficient to withstand a motion for judgment of acquittal."

## B. The Requested Instruction

Appellant submitted the following proposed jury instruction to the court:

19. Corroboration of Defendant's Statement *Ballard v. State*, 333 Md. 567, 636 A.2d 474 (1994):

You have heard testimony that the defendant made a statement to a State's witness. In order to find the defendant guilty, you must establish that independent evidence exists to corroborate, or support, the statement of the defendant.

The independent evidence necessary to support the statement of the defendant need not be full and positive proof of the corpus delicti, or crime, and may be small in amount, if such proof, when considered with the statement of the

---

You have heard testimony from, who was an accomplice. An accomplice is one who knowingly and voluntarily cooperated with, aided, advised or encouraged another person in the commission of a crime.

You must first decide whether the testimony of _____ was corroborated before you may consider it. The defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. However, only slight corroboration is required. This means there must be some evidence in addition to the testimony of _____ tending to show either (1) that the defendant committed the crime charged or (2) that the defendant was with others who committed the crime, at the time and place the crime was committed.

If you find that the testimony of _____ has been corroborated, it should be considered with caution and given such weight as you believe it deserves. If you find that the testimony of _____ has not been corroborated, you must disregard it and may not consider it as evidence against the defendant. Remember, the defendant cannot be convicted solely on the uncorroborated testimony of an accomplice.

defendant, convinces you beyond a reasonable doubt of the guilt of the defendant.

If you do not find that the State has introduced independent evidence to prove beyond a reasonable doubt that the defendant committed the crime for which he is charged, then you must find the defendant not guilty.

When asked by the trial court why appellant wanted such an instruction, the following colloquy occurred:

[DEFENSE COUNSEL]: Your Honor, I think that the case law indicates that, well, the State is relying upon the statement of the defendant. Since this is a clearly circumstantial case—

THE COURT: Right.

[DEFENSE COUNSEL]:—that there is no direct evidence that, one, [the victim] is dead; two, that [appellant] actually committed an act which resulted in the death of [the victim], that there is going to be a large emphasis placed on the statement of [appellant]. And, otherwise, there wouldn't have been the introduction of the inmates' testimony. So I believe that there has to be corroboration. And I'm not—I believe, actually, the law is clear there has to be corroboration of the defendant's statement in order for the State in a circumstantial case to be able to prove the elements of the crime.

They can't just rely upon the statement of the defendant in order to say, well, now you've heard it, you've heard that [appellant] said that he, he actually shook his wife and ultimately strangled her and killed her. And you don't need any more because his statement actually proves to you that he killed his wife. I think that the case law is clear in specifically *Ballard v. State* that there has to be an independent, there has to be independent evidence necessary to support the statement of [appellant], in order to actually prove, even in the absence of a body, the fact that the crime did occur. And that would be my request.

[STATE]: The only problem that we have, really, is we don't have any problem with the, legal principles [defense

counsel] has recited. We have some difficulty with the proposed instruction. Because this is, I think we can make it clear, Your Honor, we are not going to be arguing that the statement that the defendant made to Mr. Marshall is the only evidence against him. Our position is that there are multiple statements that the defendant made to a wide variety of people, which in various ways are admissions of his having murdered his wife. And they, they go from the statements made that establishes motive and his intent, his search [for] weaponry, his discussions with people about how to dispose of a body, so on and so forth.

So it's this, this instruction that, that by its terms articulates the proposition that there is a statement made.

[DEFENSE COUNSEL]: Well, I wouldn't object to creating the plural statements, I mean just adding an S to the statements of the defendant.

[STATE]: What is the, what is the—is there a pattern?

[DEFENSE COUNSEL]: Your Honor, I don't believe there is.

THE COURT: No. And the reason there's—the only pattern instruction there is, is statement of the defendant, which is to police.

Discussions between counsel and the trial court continued, with the State contending that an instruction was not appropriate "because this is a legal issue that really goes to [the court's] decision as to whether or not there is sufficient evidence to proceed." Then, the following exchange took place between the court and counsel:

[STATE]: I just respectfully say that I think it's a legal issue, not an issue of fact for the jury to determine. If the defense believed that there was insufficient corroboration of statements of the defendant, that would be a proper focus for a motion for judgment of acquittal. And unless we were able to satisfy you that we have corroboration of [the] statement through the circumstantial evidence that is, is abundant in this case, corroboration of the statement of the defendant, then this case should properly not go to a jury.

I think there's a reason why the pattern jury instruction committee does not have a pattern jury instruction on this. I think they would if this were a matter for a jury to decide as opposed to court.

\* \* \*

[STATE]: Do you have a case, [defense counsel], where an instruction like this was given or considered?

[DEFENSE COUNSEL]: Not that—I don't know whether there is one. I just basically relied upon the *Ballard* case.

[STATE]: Well, we don't argue the principle. I mean you're absolutely right on the principle.

THE COURT: What the State's point is is if it had been argued yesterday that Judge all you've got is the statement or statements of [appellant], and the principle of law is that other than that, you have nothing. You argued about the circumstantial evidence and—

[DEFENSE COUNSEL]: That there wasn't sufficient evidence.

THE COURT:—that there was insufficient, which would corroborate his statements if believed. So that was the legal principle.

[DEFENSE COUNSEL]: Yes, Your Honor.

THE COURT: And I granted—granted that the State's argument, I noted that the State's arguments were all circumstantial. But the state of the case law is that pursuant to *Hricko* and *Hurley* and *Tu*, that small group of cases, that you can have a successful prosecution and conviction in a homicide case where there is no body found. Add to that statements of [appellant], it's a legal principle. It's not a factual issue for the jury.

The factual issues for the jury are what they're presented with in these instructions, and if they find, as a whole, the totality of the evidence, if they are persuaded beyond reasonable doubt as to [appellant's] statements, as to the statements of the other former inmates. Understanding

that they may have had a motive or financial gain, or so on and so forth. The testimony of the family, the testimony of the friends, the testimony of the co-workers, the testimony of the police as to the efforts made, unsuccessfully to locate [the victim] if they find, as that body of evidence that it convinces them beyond reasonable doubt of one or more of these charges, then [appellant] is guilty. If not, then he's acquitted.

[DEFENSE COUNSEL]: My concern would be we don't know what they're going to contemplate back there. There might be a unanimous decision that if he never would have said it to Mr. Marshall if it wasn't true, and we believe Mr. Marshall and find him to be a trustworthy individual—

THE COURT: That's a credibility issue.

[DEFENSE COUNSEL] But then, but then if that was the sole basis of the decision, they would actually, there would be an absence of guidance that they couldn't base their decision solely on the statements that Mr.—

THE COURT: They're not. They're, they're going by— they have to—they're is [sic] going to be instructed that they have to take in to account what constitutes evidence. And the evidence is direct and circumstantial. The evidence is the witness's statements and testimony, the documentary evidence. That is the evidence about which they have to deliberate.

[DEFENSE COUNSEL]: And I understand the Court's point. I'm saying that without knowing that they, even though they are supposed to consider that, because they're considering a statement of [appellant], either as, as direct evidence actually, that they could make a determination that that in and of itself would lead them to believe that the [appellant] is guilty. And the Maryland—

THE COURT: But the fact of the matter is, they may find, they may find that that's the most persuasive, and that the other evidence does not negate it.

[DEFENSE COUNSEL]: Then they would actually render a verdict in violation of Maryland law.

THE COURT: No, they wouldn't.

[DEFENSE COUNSEL]: That's my argument[.]

After proceeding on other issues, appellant again sought the proposed corroboration instruction. At a bench conference held prior to the giving of the jury instructions, the State proposed a modification of appellant's requested jury instruction, but the modified instruction was not placed on the record. The State subsequently renewed its objection to appellant's requested instruction, maintaining that "the law is not that the independent corroborative evidence standing alone has to prove guilt beyond a reasonable doubt."

The trial court declined to provide a corroboration instruction, stating:

The—any statements of the defendant that were given are taken as a whole as part of direct and circumstantial evidence for which the jury has to judge all of the evidence and find the defendant's guilt to be of a standard beyond reasonable doubt. These instructions, as given, adequately cover that aspect.

After the jury was instructed, appellant renewed his objection to the trial court's refusal to give the proposed instruction.

"The determination of whether an instruction must be given turns on whether there is any evidence in the case that supports the instruction. The threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law for the judge." *Dishman v. State*, 352 Md. 279, 292, 721 A.2d 699 (1998) (citations omitted). Maryland Rule 4–325(c) provides:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

"In deciding whether a trial court was required to give a requested instruction, an appellate court 'must determine whether the requested instruction constitutes a correct statement of the law; whether it is applicable under the facts and circumstances of this case; and whether it has been fairly covered in the instructions given.'" *Ellison v. State*, 104 Md.App. 655, 660, 657 A.2d 402 (1995) (quoting *Mack v. State*, 300 Md. 583, 592, 479 A.2d 1344 (1984)). The trial court is under no obligation to give an instruction containing an incorrect statement of the law to the jury. *Hensen v. State*, 133 Md.App. 156, 170, 754 A.2d 1055 (2000).

Appellant's proposed instruction included the statement that, "[i]f you do not find that the State has introduced independent evidence to prove beyond a reasonable doubt that the defendant committed the crime for which he is charged, then you must find the defendant not guilty." The Court of Appeals has stated that it is not necessary that the independent evidence supporting an extra-judicial confession be " 'full and complete or establish the truth of the corpus delicti beyond a reasonable doubt or by a preponderance of proof.' " *Ballard*, 333 Md. at 575, 636 A.2d 474 (quoting *Birchead v. State*, 317 Md. 691, 706, 566 A.2d 488 (1989)). Because appellant's proposed instruction did not correctly state the law, the trial court did not err in not giving it to the jury.

## C. The Necessity of a Corroboration Instruction

In determining whether some instruction regarding corroboration was necessary in this case, the essential question is whether the sufficiency of the corroboration evidence to establish *corpus delicti* is a question of law for the court alone to decide or ultimately a question of fact to be decided by the jury.

Article 23 of the Maryland Declaration of Rights states: "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction." Md. Code (1958, 2003 Repl.Vol.), Article 23 of the Constitutions Article. In *Gore v. State*, 309 Md. 203, 210, 522 A.2d 1338

(1987) (citations and footnotes omitted), the Court of Appeals said:

> The first phrase of Article 23, that the jury shall be the judge of the law as well as the fact, has been interpreted to mean that while the jury is the exclusive judge of the fact, the jury's role with respect to the law is limited to resolving conflicting interpretations of the legal effect of the evidence and disputes concerning the substantive law of the crime for which there is a sound basis. The second phrase, that the court may pass upon the sufficiency of the evidence, added by constitutional amendment effective December 1, 1950, confers upon the courts of this State the power to pass upon the sufficiency of the evidence to sustain a conviction in a criminal case. The provisions of Article 23 have been implemented by statute, Maryland Code (1957, 1982 Repl. Vol.), Article 27, § 593,[22] and the rules of this Court, Md. Rule 4–324 (1987).[23]

---

**22.** Article 27, § 593 is now codified at Md.Code (2001), §§ 6–102 and 6–104 of the Criminal Procedure Article ("CP"). CP § 6–102 provides: "Except as provided in § 6–104 of this subtitle, in the trial of a criminal case in which there is a jury, the jury is the judge of law and fact." CP § 6–104 states:

(a) *Motion after State's evidence.*—(1) At the close of the evidence for the State, a defendant may move for judgment of acquittal on one or more counts or on one or more degrees of a crime, on the ground that the evidence is insufficient in law to sustain a conviction as to the count or degree.

(2) Subject to paragraph (3) of this subsection, if the court denies the motion for judgment of acquittal, the defendant may offer evidence on the defendant's behalf without having reserved the right to do so.

(3) If the defendant offers evidence after making a motion for judgment of acquittal, the motion is deemed withdrawn.

(b) *Motion after all evidence.*—(1) The defendant may move for judgment of acquittal at the close of all the evidence whether or not a motion for judgment of acquittal was made at the close of the evidence for the State.

(2) If the court denies the motion for judgment of acquittal, the defendant may have review of the ruling on appeal.

**23.** Md. Rule 4–324 provides:

(a) **Generally.** A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant

1 *McCormick on Evidence* § 145, at 522 (Strong 5th ed. 1999) (*"McCormick 5th"*), states that the corroboration requirement "is clearly a requirement of evidence *sufficiency* to be applied by an appellate court reviewing a conviction, and—apparently—by a trial judge in deciding whether there is sufficient evidence for a case to go to the jury." (Emphasis in original.)

The corroboration requirement may arise at different times during the course of the trial. For example, it may be raised when the confession is introduced into the proceedings. In that instance, the trial court in its discretion could determine that the evidence of corroboration was sufficient and admit the confession unconditionally or it could admit the evidence conditionally, subject to further evidence being introduced. In the latter situation, the court if it deems sufficient evidence is not forthcoming, the confession would not be considered in consideration of a motion for judgment of acquittal. As the Court of Appeals noted in *Ballard*, 333 Md. at 571 n. 1, 636 A.2d 474:

> The corroboration requirement, ... **is a rule of substantive law and not a rule of evidence.** Thus, although [defendant's] multiple admissions and confessions came into evidence essentially without objection, [defendant] was not precluded from contending, in support of his motion for a judgment of acquittal, that the confessions could not be

shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case.

(b) **Action by the court.** If the court grants a motion for judgment of acquittal or determines on its own motion that a judgment of acquittal should be granted, it shall enter the judgment or direct the clerk to enter the judgment and to note that it has been entered by direction of the court. The court shall specify each count or degree of an offense to which the judgment of acquittal applies.

(c) **Effect of denial.** A defendant who moves for judgment of acquittal at the close of evidence offered by the State may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. In so doing, the defendant withdraws the motion.

considered in weighing the sufficiency of the evidence to convict. The timing of a ruling on the sufficiency of corroboration of the *corpus delicti, i.e.,* whether made conditionally or unconditionally when a confession or admission is offered, or deferred until ruling on a motion for judgment of acquittal, is a function of defense tactics and trial court discretion. [Emphasis added.] [24]

We conclude that, as a general rule, the court makes the legal determination of whether the evidence, including the sufficiency of the independent evidence corroborating appellant's confession for the purpose of establishing the *corpus delicti* of the crime, is sufficient to support a guilty verdict. When that determination is made, the case goes to the jury to decide whether, based on all of the evidence, it is convinced of a defendant's guilt beyond a reasonable doubt. Therefore, a corroboration instruction is not necessary.

Although there is split authority on the issue, that position has been adopted in both federal and state courts, and, as noted, is "generally agreed" upon by the commentators. *See Perovich v. United States,* 205 U.S. 86, 91–92, 27 S.Ct. 456, 51

---

**24.** Treating the corroboration rule as a rule of evidence, 7 J. Wigmore, *Evidence* § 2073, at 530 (1978), states:

(b) The application of all rules of evidence rests with the judge, not the jury; hence, under this rule requiring the existence of some corroborative evidence of the corpus delicti, it is for the *trial judge* to say whether there has been introduced such evidence; i.e., on the general principle of the judicial function (§ 2550 *infra* ) he may take the case from the jury if there is not at least some evidence sufficient to satisfy the rule:

\* \* \*

(c) Yet the same question comes up again for determination by the jury, after retiring to consider their verdict. They are bound by the rule of evidence not to convict unless there is, in their belief, some evidence of the corpus delicti to corroborate the confession. The judge's ruling was provisional only, preliminary to allowing the case to go to the jury; they in their turn must conclude, *without reference to the judge's ruling,* whether the corroboration exists to satisfy them. [Emphasis in original; footnotes omitted.]

Nevertheless, Wigmore, at 7 *Wigmore Evidence* § 2070, at p. 510 (1978), maintains that no corroboration rule should be necessary. *McCormick 5th* § 145, at 524 indicates that "commentators have generally agreed" with this position.

L.Ed. 722 (1907) (stating: "Error is also alleged in refusing an instruction as to the evidence necessary to establish the *corpus delicti.* It is enough, in answer to this objection, to refer to the summary of the testimony we have already given, and to note the fact that the court instructed that the evidence must be such as to satisfy the jury beyond a reasonable doubt."); *United States v. Howard,* 179 F.3d 539, 543 (7th Cir.Ind.1999) (holding that "a district court is not obligated to instruct the jury to make a specific finding as to whether the government presented substantial independent evidence to corroborate the defendant's confession"); *see also United States v. Dickerson,* 163 F.3d 639, 642, 333 U.S.App.D.C. 348 (1999) (holding that the jury need not be separately instructed on the need for corroboration of a defendant's out of court statement used as a basis for proof of an element of possession of a firearm because the issue is "akin to other admissibility issues," which the trial court alone decides whether the corroboration test has been met); *Gribble v. State,* 808 S.W.2d 65, 72 n. 15 (Tex.Crim.App.1990) (stating: "Indeed, when evidence independent of the confession is alone sufficient to prove *corpus delicti,* the jury need not even be instructed that an extrajudicial confession must be corroborated."); *People v. Rosario,* 166 Ill.App.3d 383, 395, 116 Ill.Dec. 805, 519 N.E.2d 1020 (1st Dist.1988) (holding that the trial court did not commit reversible error in refusing to instruct the jury that "[a] confession of a defendant without corroboration by independent evidence is insufficient, standing alone, to support a conviction."); *Watkins v. Commonwealth,* 238 Va. 341, 350–51, 385 S.E.2d 50 (1989) (holding that "where the court has made a threshold determination that sufficient corroboration of the *corpus delicti* has been adduced, independent of a confession, to permit the confession to go to the jury, an instruction submitting the issue of corroboration to the jury is inappropriate"); *Aubuchon v. State,* 645 S.W.2d 869, 873 (Tex.App.1983)(citing *Aranda v. State,* 506 S.W.2d 221 (Tex. Cr.App.1974) (stating: " 'When the body of the crime that is, the corpus delicti) is established by other evidence, as is true in the instant case, an instruction on corroboration is not

necessary.' "); *State v. Weller,* 162 Vt. 79, 82–83, 644 A.2d 839 (1994) (holding that "the question of whether there is sufficient corroboration of the *corpus delicti* is a legal question to be decided by the trial court alone and should not be submitted to the jury for redetermination," but the jury weighs the evidence and is "charged with determining whether the State proved the elements of the crime beyond a reasonable doubt").

In *United States v. Singleterry,* 29 F.3d 733 (1st Cir.Me. 1994), the Court explained why a corroboration jury instruction is not required. We quote at length:

First, if the district court loses confidence in its earlier determination of the corroboration issue and the evidence is otherwise inadequate to support a conviction, the proper course would be to enter a judgment of acquittal. Alternatively, if the government's remaining evidence could support a finding of guilt but the jury's incurable exposure to the confession raises serious questions about the prospect of a fair trial, the proper course would be to declare a mistrial. *See Stewart v. United States,* 366 U.S. 1, 10, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961); *United States v. Sepulveda,* 15 F.3d 1161, 1184 (1st Cir.N.H.1993), cert. denied, 512 U.S. 1223[, 114 S.Ct. 2714, 129 L.Ed.2d 840] (1994).

Second, a confession otherwise admissible under *Opper [v. U.S.,* 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954)] may nevertheless be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403.

Third, particularly where a full confession dominates the government's proof, it is fair to assume that a jury will interpret its duty to find guilt beyond a reasonable doubt to mean that it cannot simply accept a confession at face value. *See D'Aquino v. United States,* 192 F.2d 338, 357 (9th Cir.1951) (holding that where there is adequate corroboration of the confession "the usual instructions on presumption of innocence and reasonable doubt adequately cover[ ] all that the jury need be told upon this question of [corroboration]") (citing *Pearlman v. United States,* 10 F.2d 460 (9th Cir.1926)), *cert. denied,* 343 U.S. 935[, 72 S.Ct. 772, 96 L.Ed.

1343] (1952); McCormick, supra, § 145, at 564 ("Nor is there sufficient need to submit the matter to the jury, as long as the jury is adequately sensitized to the need to find all elements of the crimes charged beyond a reasonable doubt.").

Fourth, we note that a judge has wide latitude to select appropriate, legally correct instructions to ensure that the jury weighs the evidence without thoughtlessly crediting an out-of-court confession. Accordingly, even if the district court has properly admitted evidence of a confession, the court has the discretion to determine that the question of trustworthiness is such a close one that it would be appropriate to instruct the jury to conduct its own corroboration analysis.

*Singleterry,* 29 F.3d at 738–39.

The *Singleterry* Court declined to adopt the rule that, "even after a court has properly admitted evidence of a confession and correctly tested the sufficiency of the evidence to support a conviction, the court has a responsibility . . . to instruct the jury to determine that the confession is trustworthy before considering it as evidence of guilt." *Id.* at 738. The Court, however, kept open the possibility that, in a close case, a jury instruction "would be appropriate." *Id.* at 739. *See State v. Hale,* 45 Haw. 269, 283–84, 367 P.2d 81 (Haw.1961) (stating that a jury should not weigh "the proof of the corpus delicti separately from the confession," unless the trial judge is in doubt as to the sufficiency of the independent proof to establish the *corpus delicti;* in such case, "the jury should be instructed on the point of corroboration upon request and submission of a proper instruction.").

Some jurisdictions have held that a corroboration jury instruction is required in all cases, and others have held that an instruction is necessary under certain circumstances. *See United States v. Marshall,* 863 F.2d 1285, 1287 (6th Cir.Ohio 1988) (holding that it was erroneous for the trial court not to instruct the jury that corroboration of the defendant's statement was necessary); *People v. Reade,* 13 N.Y.2d 42, 47, 241

N.Y.S.2d 829, 191 N.E.2d 891 (1963) (holding that by refusing to instruct the jury that a confession "is not sufficient" to warrant a conviction "in that additional proof that the crime charged had been committed," the trial court, in effect, told the jury that it "could return a verdict of guilt solely on the strength of the confession"); *People v. Crain*, 102 Cal.App.2d 566, 582, 228 P.2d 307 (Cal.App.1951) (citing *People v. Putnam*, 20 Cal.2d 885, 890, 129 P.2d 367 (1942), stating that a trial court has the duty to instruct the jury with respect to "admission of confessions and the necessity of independent proof of the *corpus delicti* "); *see Griner v. State*, 121 Ga. 614, 615, 49 S.E. 700 (1905) (stating that it was proper for the trial court to charge the jury that "confessions of guilt should be received with great caution, and that a confession alone, uncorroborated by other evidence, will not justify a conviction"); *see also* Fed. Pattern Crim. Jury Inst. (1st Cir.) § 2.10 (stating: "You have heard evidence that [defendant] made a statement in which the government claims he/she admitted certain facts. It is for you to decide (1) whether [defendant] made the statement and (2) if so, how much weight to give it. In making those decisions, you should consider all of the evidence about the statement, including the circumstances under which the statement may have been made [and any facts or circumstances tending to corroborate or contradict the version of events described in the statement]."); Oklahoma Jury Instructions—Criminal § 9–13, "Necessity for Corroboration of Confessions" (providing: "[Should you find that a confession was made by the defendant and was made freely and voluntarily and in compliance with the rules of law set forth above, then you are instructed:] A confession alone does not justify a conviction unless it is corroborated, that is confirmed and supported by other evidence of the material and basic fact or facts necessary for the commission of the offense charged. Unless you find that the confession, if made, is corroborated, you must disregard it.") (brackets in original).

In *Weller v. State*, 150 Md. 278, 284, 132 A. 624 (1926), the Court of Appeals, having found confessions made by the defendant to be "voluntarily and freely made," discussed the

"general rule ... that an extrajudicial confession ... does not warrant a conviction, unless there be, also, independent evidence to establish the *corpus delicti* of the crime." The Court went on to say that,

[i]n this jurisdiction, where the jury in a criminal case is judge of both the law and the facts, the rule is enforced, primarily, by rejecting the evidence of an extrajudicial confession ..., unless there then exists, or there is a proffer of proof later to furnish, some independent evidence to establish the occurrence of the specific kind of injury or loss or act, through a criminal agency, which together established the commission of a crime by some one; and, secondarily, by granting a new trial when the conviction was improperly obtained through insufficient corroboration of the confession.

*Id.* at 284, 132 A. 624.

Later, in *Jones,* 188 Md. at 272, 52 A.2d 484, the Court of Appeals, in discussing the *corpus delicti* rule, said: "In this case, we consider whether the *corpus delicti* has been established only in connection with the admissibility of a confession. Otherwise, it is a matter for the jury, not reviewable here." In *Jones,* 188 Md. at 271–72, 52 A.2d 484, where three judges sat as a jury, the Court said that the independent evidence establishing the *corpus delicti* is "sufficient if, when considered in connection with the confession, it satisfies the jury beyond a reasonable doubt that the offense was committed and that the defendant committed it." That principle is repeated in many subsequent cases. *Bagley v. State,* 232 Md. 86, 96, 192 A.2d 53 (1963) (quoting *Pierce,* 227 Md. at 226, 175 A.2d 743); *see Ballard,* 333 Md. at 575, 636 A.2d 474; *Bradbury,* 233 Md. at 424–25, 197 A.2d 126; *Foster v. State,* 230 Md. 256, 258–59, 186 A.2d 619 (1962); *Cooper,* 220 Md. at 190–91, 152 A.2d 120; *Williams v. State,* 214 Md. 143, 154–55, 132 A.2d 605 (1957); *Hall v. State,* 213 Md. 369, 375, 131 A.2d 710 (1957); *Bollinger v. State,* 208 Md. 298, 306, 117 A.2d 913 (1955); *Davis v. State,* 202 Md. 463, 470, 97 A.2d 303 (1953); *Wood v. State,* 192 Md. 643, 650, 65 A.2d 316 (1949); *Jones,* 188 Md. at 271–72, 52 A.2d 484; *Markley v. State,* 173 Md.

309, 317–18, 196 A. 95 (1938); *Weller,* 150 Md. at 284, 132 A. 624; *Crouch v. State,* 77 Md.App. 767, 769–70, 551 A.2d 943 (1989); *Lemons,* 49 Md.App. at 473, 433 A.2d 1179.

That the *corpus delicti* rule is one of legal sufficiency is consistent with the position of the Court of Appeals in *Bollinger* that, "[g]enerally, an uncorroborated confession does not establish *as a matter of law* the commission of crime beyond a reasonable doubt." *Bollinger,* 208 Md. at 305, 117 A.2d 913 (emphasis added). Also, in *Bradbury,* the Court said that "[i]t is ... well settled that an extrajudicial confession of guilt ..., unsupported by other evidence, is not sufficient to warrant a conviction." *Bradbury,* 233 Md. at 424, 197 A.2d 126.

*Jones* and *Weller,* like the case of *Luery v. State,* 116 Md. 284, 81 A. 681 (1911), wherein the Court of Appeals presented a "brief historical background as well as the reasoning behind the development of" the accomplice rule, were decided prior to the time that the Court had "a duty [or] a right to review the *legal sufficiency* of the evidence in criminal cases." *Wright v. State,* 219 Md. 643, 647, 150 A.2d 733 (1959) (emphasis supplied). Now, by judging the legal sufficiency of the corroboration evidence when it considers a judgment of acquittal, it falls upon the trial court to insure that a defendant is not convicted on his confession alone. When properly preserved, issues of legal sufficiency may be reviewed again on appellate review.

If the evidence independent of the confession is legally sufficient to establish the *corpus delicti,* there is no reason that the jury consider the proof of the *corpus delicti* separate from the confession. Rather, the jury should weigh the evidence as a whole in determining that the offense was committed and that the defendant committed it. At that point, the critical instruction is a proper "reasonable doubt instruction." *See F.J. Wigmore Evidence* § 2073, at 532 (1978).

In this regard, one case deserves discussion. In *Bradbury, supra,* the Court of Appeals was asked to consider whether the defendant's motion for judgment of acquittal should have been granted because the evidence was insufficient to convict

him of the common law crime of sodomy and whether the trial court erred in its instruction to the jury. The victim was a 12–year–old boy. Because the medical evidence did not establish penetration, the testimony of the young boy was central to the State's case.

The trial court advised the jury that a

"defendant in a criminal case cannot be convicted upon his extrajudicial confession alone. There must be corroboration. * * * If the confession is voluntary and you believe it is a valid confession, then you would need but slight evidence of corroboration. Slight evidence of corroboration has been defined as an infinitesimal amount of corroboration, a very small amount of corroboration. That is a very small amount of evidence in addition to the confession if the confession were believed."

*Id.* at 423, 197 A.2d 126. Bradbury contended that the trial court erred in advising the jury that only "slight evidence of corroboration" was necessary to establish the *corpus delicti.* He argued that the correct instruction was that "a confession must be corroborated by independent evidence which *substantially* establishes the *corpus delicti.*" *Id.* at 424, 197 A.2d 126 (emphasis in original).

Acknowledging that it was "well settled that an extrajudicial confession of guilt by a person accused of crime, unsupported by other evidence, is not sufficient to warrant a conviction," *id.* at 423, 197 A.2d 126, the Court of Appeals said:

While the trial court should have advised the jury that the supporting evidence, independent of the confession, should relate to and establish the *corpus delicti,* it did not commit prejudicial error by stating that only "slight evidence of corroboration" was necessary, since, under the circumstances of this case, there was some proof of penetration and only slight evidence of that fact was sufficient to support the charge of sodomy irrespective of whether the accused confessed or admitted the charge.

*Id.* at 425, 197 A.2d 126.

*Bradbury* does not stand for the principle that a *corpus delicti* instruction is always necessary because that was not

the question before the Court. Rather, the focus of the case was on the correctness of the instruction that had been given. Moreover, the Court found that omission of language that the supporting evidence should relate to the *corpus delicti* did not constitute "prejudicial error" because, even without Bradbury's confession, there was "some proof" of penetration and only slight evidence was necessary. In other words, the Court, in effect, determined the legal sufficiency of the evidence. If the jury was to determine if the *corpus delicti* had been established, it would have been important to instruct that the supporting evidence should relate to the *corpus delicti.*

As we have discussed above, there was in this case before us substantially more than "some proof," i.e., sufficient evidence, to establish *corpus delicti* and to support a conviction of murder in the first degree, even in the absence of appellant's confession. We have not been directed to any Maryland case, particularly one since 1950, when the courts were granted the power to pass upon the sufficiency of the evidence to sustain a criminal conviction, that mandates a jury instruction regarding corroboration of a confession.

We are not persuaded by appellant's analogy to the corroboration requirement in cases involving accomplice testimony and to MPJI–Cr 3:11A. In reference to the purpose to be served by the *corpus delicti* rule, *McCormick* has indicated, "[t]raditionally and generally, the requirement appears to have a relatively modest objective—protecting against the risk of conviction for a crime that never occurred." *McCormick 5th* § 145 at 523. In *Crouch,* 77 Md.App. at 769, 551 A.2d 943, we indicated that the limited purpose of the corroboration requirement is "to prevent a mentally unstable person from confessing to and being convicted of a crime that never occurred." Corroboration of an accomplice's testimony has been required because the testimony is " 'admittedly contaminated with guilt' " and the accomplice "may have an ulterior motive for testifying, such as seeking a reduced sentence or charge." *McCray v. State,* 122 Md.App. 598, 605, 716 A.2d 302 (1998) (quoting *Turner v. State,* 294 Md. 640, 642, 452 A.2d 416 (1982)).

Not only is the basis for the rule different in each instance, what is to be corroborated is also different. As Judge Moylan explained in *Crouch,* 77 Md.App. at 768–69, 551 A.2d 943:

> The corroboration requirement as to a defendant's confession is very different from the corroboration requirement as to accomplice testimony. When a conviction is based upon the testimony of an accomplice, there must be some independent corroboration establishing the defendant's criminal agency. When a conviction is based upon the testimony or statements of the defendant himself, on the other hand, there must be some independent corroboration of the *corpus delicti* of the crime itself.

The ultimate determination of criminal agency and credibility are always issues for the trier of fact.

No questions have been raised regarding appellant's mental stability. Nor are there any voluntariness or general trustworthiness issues raised regarding the extra-judicial confession.

Appellant's confession was heard by the jury through the medium of David Marshall. As to David Marshall's credibility, the jury was instructed to consider "with caution," the testimony of a witness who testified for the State as a result of a plea agreement or financial benefit. This instruction was similar to MPJI–Cr 3:11, which requires an instruction that accomplice testimony "be considered with caution and given such weight as you believe it deserves."

### Conclusion

The trial court did not err in denying appellant's request for a jury instruction. Moreover, there is no indication that the trial court overlooked its obligation to avoid or limit undue prejudice stemming from evidence of appellant's voluntary confession. In denying the motions for judgment of acquittal, the trial court determined that the independent evidence establishing the *corpus delicti* was legally sufficient to permit the jury to consider the confession along with the other evidence in deciding whether a crime had been committed and

that appellant committed it. We, too, find the independent evidence legally sufficient to establish the *corpus delicti.*

The trial court properly instructed the jury as to the State's burden of proof:

> In making your decision, you must consider the evidence in this case. That is the testimony from the witness stand, physical evidence or exhibits admitted into evidence, stipulations.

> In evaluating the evidence, you should consider it in light of your own experiences. You may draw any reasonable inferences or conclusions from the evidence that you believe to be justified by common sense and your own experiences.

> \* \* \*

> **In reaching a verdict, you should weigh all of the evidence presented, whether direct or circumstantial. You may not convict the defendant unless you find that the evidence, when considered as a whole, establishes guilt beyond a reasonable doubt.**[25] [Emphasis added.]

Here, the circumstantial evidence indicated that the victim was aware of appellant's ongoing affair with a minor; the victim had stated that she was going to report the affair to the police; that on the night of the victim's disappearance, appellant left work early, met with Cole, who then observed appellant go to his house; that the victim was going to leave appellant; appellant had asked co-workers about killing a person and disposing of the body; appellant had asked friends about obtaining a gun; appellant had stated to Cole that "he wanted to kill [the victim]," stating that he would either "shoot" or "strangle her," and "put her body in the truck with the waste," where "nobody would ever find her;" appellant stated that the victim "wasn't coming back"; and appellant had conspired to fabricate an alibi; and that there had been an

---

**25.** The trial court also instructed the jury regarding witness testimony and a list of factors for determining "whether a witness should be believed."

exhaustive search, but no trace of the victim for five years. The jury was presented with more than sufficient evidence to corroborate appellant's confession, and thus, the jury was not in jeopardy of convicting appellant solely based on an uncorroborated extra-judicial confession of guilt. Based on all of the evidence, a rational trier of fact could have determined beyond a reasonable doubt that appellant committed first degree murder.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**