864 A.2d 226

**Marvin CANTINE**

v.

**STATE of Maryland.**

**No. 1388, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Dec. 27, 2004.

**394**

Brian J. Murphy, Assigned Public Defender (Nancy S. Foster, Public Defender, on brief), Baltimore, for Appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Appellee.

Panel: SALMON, KRAUSER, and ANDREW L. SONNER, (Retired, specially assigned), JJ.

ANDREW L. SONNER, Judge (Retired, specially assigned).

A jury in the Circuit Court for Baltimore City found Harvey Lippman and Marvin Cantine guilty of conspiracy to possess heroin with the intent to distribute, but it found them not guilty of conspiracy to possess heroin and conspiracy to distribute heroin.[1] Additionally, the jury found Cantine not guilty of being a kingpin. The court sentenced Lippman to thirty-five years' imprisonment, suspending all but fifteen years. It also imposed a $25,000 fine. The court sentenced Cantine to twenty-five years in prison without the possibility of parole pursuant to the "three time loser" statute.[2]

Appellants jointly present five issues on appeal, which we set forth here substantially as they appear in their briefs:[3]

---

1. Harvey Lippman and Marvin Cantine were tried with Edwin Richardson. Police also charged David Blake, Harold Ferguson, Derrick Thomas, and Tia Thomas, but these individuals were not tried with Lippman, Cantine, and Richardson. The jury found Richardson not guilty of all counts.

2. *See* Md. Code (1957, 1996 Repl. Vol., 2001 Supp.), Art. 27 § 286(d).

3. Lippman and Cantine presented separate appeals that were docketed with different case numbers. Lippman's case proceeded on the submit-

1. Did the trial court err in denying Appellants' motion to suppress the fruits of a court-ordered wiretap?

2. Did the trial court err in denying Appellants' motion to disclose the identity of a confidential informant?

3. Did the trial court err in admitting opinion evidence from police officers?

4. Did the trial court err in admitting evidence that David Blake gave a false name when accosted by the police?

5. Did the trial court err in entering the jury deliberation room accompanied by the prosecutor and not defense counsel?

Additionally, appellants put forth different arguments relating to Lippman's statements to police in October 2001. Lippman asks:

6a. Did the trial court err in refusing to exclude an exculpatory portion of Lippman's statement to police while admitting an arguably inculpatory portion?

Cantine asks:

6b. Did the trial court err in refusing to declare a mistrial when the jury heard the inadmissible portion of Lippman's redacted statement?

Lippman queries:

7. Did the trial court err in refusing to propound two requested instructions to the jury?

Lastly, Cantine asks:

8. Did the trial court err in sentencing Cantine to twenty-five years without parole as a "three-time loser"?

We determine that the trial court erred when it sentenced Cantine as a subsequent offender, so we remand for re-sentencing. On all other issues, we affirm.

---

ted on brief docket, but oral argument was held for Cantine's case. Nonetheless, because the circuit court tried the defendants together, and their appeals raise virtually the same issues, we submit this opinion for each of their separately docketed appeals.

## BACKGROUND

During the Fall of 2001, Federal and Maryland authorities investigated the activities of Marvin Cantine, whom they believed operated as a narcotics kingpin in New York and Baltimore, and Harvey Lippman, whom they believed served as Cantine's lieutenant. Investigators secured approval from the Circuit Court for Baltimore City to conduct wiretap surveillance of Cantine, Lippman, and others believed to be involved in this drug ring.

According to appellants, the "most significant surveillance" took place on October 23, 2001, when agents saw Lippman and Cantine meet at the Baltimore Marriott Waterfront Hotel. Agents and officers staked out the hotel because of information that they had intercepted with wiretaps. As Lippman left the meeting, agents had a uniformed officer conduct a traffic stop. The agents ultimately intervened, and searched Lippman's car. They recovered a handgun, over $10,000 in cash, and marijuana.

One month later, on November 19, 2001, police recovered a little more than six pounds of heroin from inside a hidden compartment in a vehicle that an associate of the drug ring, Derrick Thomas, drove from New York to Baltimore. The approximate street value of this heroin was $1,000,000. The following day, agents searched Lippman's apartment and found over $120,000 in cash, a bag of highly diluted heroin, marijuana, packaging, and ammunition. The State tried Lippman, Cantine, and Edwin Richardson together. Before trial, Lippman moved to adopt all the motions filed by his co-defendants. The record does not reveal the status of that request, although during the course of the trial, the court agreed that an objection by one defendant was an objection by all three men. The trial lasted six weeks, and much of the testimony related to interpreting the alleged conspirators' intercepted phone calls.

Before the jury retired for deliberation, the State asked to show jurors how to use playback equipment in the deliberation room so that they could listen to the intercepted calls at their

discretion. Lippman opposed this request, and the court decided to "wait and see" if the jurors requested assistance. Following further requests by the State, however, the court agreed to escort the State into the jury room. The court then asked, "Is there anything else, counsel?," to which no objection was lodged. The judge and the prosecutor went into the jury deliberation room. When the court returned, it announced:

> Just a second. Let the record[ ] [s]how I just came out of the jury room and [the State], who was demonstrating the use of the computer disk process and the only communication there was between [the State] and one of the jurors who [the State] was showing how to use that process. There was no discussion of anything about the case.

> I asked the jury when they wanted to go to lunch, which was sort of requested by one of the counsel. Some said 12:00, some said 12:30. And I told them they didn't have to—they sort of tentatively agreed on 12:30 but that if they were in the middle of a very important discussion they didn't have to stop at 12:30. That's it.

Defense counsel then objected, but did not request curative action. On its own initiative, the court denied any motion for a mistrial.

### DISCUSSION

### I.

### Fruits of the Court-ordered Wiretap

■ Appellants argued below that police failed to exhaust conventional investigative techniques before resorting to wiretaps, and they moved to suppress evidence from the October car stop, and the November search of Lippman's house, as fruits of the wiretaps. The court denied these motions.

On review, we must determine whether "the application and supporting affidavits ... [were] sufficient to demonstrate the need for electronic surveillance." *Vandegrift v. State*, 82 Md.App. 617, 627, 573 A.2d 56 (1990). We give " 'considerable deference' to the [trial] court's determination that 'exhaustion'

has been shown." *U.S. v. Oriakhi,* 57 F.3d 1290, 1298 (4th Cir.1995) (citation omitted).

█ Every application for an *ex parte* wiretap order must include "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Md. Code (1974, 2002 Repl. Vol.), Cts. & Jud. Proc. § 10–408(a)(1)(iii). "The underlying purpose of this requirement is to guard against the use of electronic surveillance as an initial investigative tool." *Vandegrift,* 82 Md.App. at 627, 573 A.2d 56. These requirements are mandatory, and the failure to satisfy them dictates the suppression of all derivative evidence. *See State v. Mazzone,* 336 Md. 379, 383, 648 A.2d 978 (1994).

█ We are mindful that affidavits, like the one that accompanied the State's surveillance application, often contain boilerplate language. Certainly, "courts are not free to infer from the mere presentation of an application or petition, supported by an affidavit, that normal investigative procedure will not work." *Allen v. State,* 89 Md.App. 25, 35, 597 A.2d 489 (1992). In making its case for electronic surveillance, however, the State "need not exhaust every conceivable investigative possibility before seeking a wiretap order." *Id.* (citation omitted).

In denying the motion to suppress, the court considered the agents' seventy-page affidavit offered in support of their application. It found:

> The affiants had been conducting surveillance over several years, more intensively, for several months prior to the submitted affidavit. Like Salzman the affiants checked criminal arrest records, used informants, toll records, pin registers. They also set up controlled calls and buys. In addition they articulated that bumper beepers and long term surveillances would likely result in detection. As in Salzman the known CDS members only dealt with old friends and associates. The affiants believed further checks of toll records or pin register would probably not reveal the higher ups, thus like in Salzman the affiants set forth an

exhaustive list in their affidavits to the issuing Judge. In addition, the affidavit ... indicated that the investigation was ongoing and, however, the affiants had been unable to locate the stash house because the Defendants kept changing their telephone numbers and thereby blocking the affiants receiving their communications.... In light of the investigative procedures outlined in the affidavit, the State ... has shown that the affiants demonstrated to the issuing Judge that normal investigative measures had been tried and failed. Admittedly, the affiants probably could have made more than two attempts to collect trash. They also could have provided better factual support for the claim that cellular phone calls could not be monitored, however, the State does not need to exhaust every conceivable investigative possibility before seeking a wiretap order. As Defense Counsel admitted in their Motion to Suppress the police utilized many techniques including the use of confidential informants.

According to the affidavit, officers checked arrest records, employed three informants, reviewed toll records and pin registers, and set up controlled buys. Considering the application, the affidavit in support of it, and the court's findings, we determine that the State indeed demonstrated the need for the wiretaps.

## II.

### Identity of the Confidential Informant

Prior to trial, appellants sought to discover the identity of informer "CS1," but the court denied this request. In reviewing the lower court's determination, "we look to see whether the court applied correct legal principles and, if so, whether its ruling constituted a fair exercise of its discretion." *Edwards v. State*, 350 Md. 433, 442, 713 A.2d 342 (1998). The State's privilege to withhold the identity of an informant is well established in Maryland. *Brooks v. State*, 320 Md. 516, 522, 578 A.2d 783 (1990). This privilege protects the public's interest in law enforcement. *See Roviaro v. United States*,

353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), and is particularly important for the enforcement of narcotics laws, *see Brooks*, 320 Md. at 522, 578 A.2d 783.

■■■ The defendant's interest in a fair trial, however, could offset the privilege. "Where the disclosure of an informer's identity ... is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro*, 353 U.S. at 60–61, 77 S.Ct. 623. The trial court must balance the "materiality of [the informer's] testimony to the determination of the accused's guilt or innocence ... against the State's interest in protecting the identity of the informer." *Brooks*, 320 Md. at 525, 578 A.2d 783. For example, when the informer is a mere "tipster," a person who provides information to the authorities without participating to some extent in the criminal activities for which the defendants stand trial, the government is generally entitled to withhold disclosure. *Id.*

Appellants argued below that CS1's presence at trial was necessary to interpret the meaning of a monitored phone call between CS1 and Lippman. During the call, CS1 asked, "do you want me to bring all the cards to the next game, we'll piece it together." CS1 said this was code for whether Lippman wanted full or partial payment. The court also received testimony *in camera* from Detective Keith Gladstone, related mostly to concerns about the safety of CS1.

·The court concluded that CS1 was a mere tipster, who did not participate in the conspiracy for which appellants were charged. CS1 took part in a controlled buy of cocaine, not heroin, and played no part in the conspiracy for heroin distribution. Furthermore, a detective witnessed the phone calls between CS1 and Lippman, and the defense could have cross-examined him about his observations and the informant's credibility. Under the circumstances, the disclosure of CS1 would have served little probative value. We find no error in the denial of the motion for disclosure.

### III.

### Detectives' Expert Opinions

Appellants challenge the expert opinion evidence of Detective John Jendrek and Detective William Bristol as having invaded the province of the jury by expounding upon the ultimate issue of guilt or innocence. We review the trial court's decision to admit or reject expert testimony for an abuse of discretion only. *See Cook v. State*, 84 Md.App. 122, 138, 578 A.2d 283 (1990).

Here, the State asked Detective Jendrek, "Why did you write the wiretap affidavit?," and he responded: "Because I believed that Mr. Marvin Cantine and Mr. Harvey Lippman were involved in selling drugs." Appellants did not object, and therefore they failed to preserve this issue for review. *See* Md. Rule 4–323(a).

Moreover, had they preserved the issue, we would find no error. "[T]estimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact." Md. Rule 5–704(a). Jendrek's belief that Cantine and Lippman were involved in the sale of drugs was the reason the police obtained the wiretap. There was no abuse of discretion.

Next, we turn to appellants' objections to the testimony of Detective Bristol, who was accepted as an expert in the field of drug-trafficking. He testified, over objection, that "Harvey Lippman takes care of the business, as far as collecting money and distributing narcotics to all the underlings in the organization." Detective Bristol also testified that Lippman was "under Cantine" in the "organization," that Derrick Thomas was the "carrier for Marvin Cantine and Harvey Lippman," and that Cantine, Lippman, and David Blake "control[led] the heroin organization throughout Baltimore City."

Appellants direct us to *Cook v. State*, 84 Md.App. 122, 578 A.2d 283 (1990), in which this Court reversed various narcotics-related convictions, including conspiracy, because the trial court admitted improper opinion testimony. Police had

searched a house and found a large number of vials, some filled with cocaine and others empty, assorted packaging materials, pipes, and a gun. Based on these seizures, an officer opined at trial that one of the defendants was the "head of the organization," and another defendant held a lesser role. *Id.* at 139, 578 A.2d 283. We reasoned that the expert opinion was unnecessary for the jury to understand the facts, enjoyed no factual basis, and was prejudicial. *See id.*

We also noted that "there is [no] hard and fast rule for the acceptance or rejection of expert opinion evidence as to ultimate facts that may tend to encroach upon the jury's function to determine guilt or innocence, or the credibility of witnesses, or to resolve contested facts." *Id.* at 142, 578 A.2d 283. For each case, the court must weigh the usefulness of the expert opinion against the prejudice to the defendant. *See id.* Indeed, sometimes

> it may be necessary for the expert to express [an] opinion on the ultimate fact in issue . . . in order for the jury to get the benefit of the expert's knowledge, where such knowledge is necessary for an understanding of the facts and cannot reasonably be imparted in a less prejudicial manner.

*Id.*

Unlike the jury in *Cook,* the jury here had to understand a complex, multi-state, multi-defendant prosecution that grew out of months of investigation and surveillance. The jury spent hours listening to telephone calls and reading transcripts. Detective Bristol's opinion as to the roles of the various callers organized the evidence, and his specific expertise in interpreting the callers' vernacular could be helpful to the jury. Furthermore, similar evidence that Lippman collected money, and distributed narcotics to other members of an organization headed by Cantine, was admitted without objection.

## IV.

### Use of an Alias By A Non–Party

Appellants contest the trial court's admission of testimony that David Blake, who was described as a "street

lieutenant in the organization," used an alias when police stopped his car on October 15, 2001. Appellants assert that the use of an alias by Blake was irrelevant and prejudicial. Because defense counsel later elicited the same testimony, this issue has been waived for review. *See Hunt v. State,* 321 Md. 387, 433, 583 A.2d 218 (1990).

## V.

### Entering the Jury Room

Appellants contend that reversible error resulted when the presiding judge escorted the prosecutor into the jury room and allowed the prosecutor to demonstrate how to use the playback equipment. We remind appellants that they did not object to this action before it happened, or even request to join the State in its endeavor. When counsel fails to object, or request curative action, the alleged error ordinarily is waived. *See Hill v. State,* 355 Md. 206, 219, 734 A.2d 199 (1999); *see also* Md. Rule 8–131(a); Md. Rule 4–323(c).

Nevertheless, this Court does not condone such ventures into the jury room by the Court and the State because they threaten, unnecessarily, the appearance of judicial impartiality. Indeed, allowing the State to appear as a friend of the court may impress upon the jury, perhaps subconsciously, that the State's case has the imprimatur of the court. Here, however, there were no indicia of prejudice. The judge promptly stated upon return that he had asked the jurors about lunch and that the prosecutor showed one juror how to use the playback equipment. He further stated "[t]here was no discussion about the case."

Defense counsel's subsequent objection "for the record" was too little, too late. And even then, counsel failed to request a curative action. The court, *sua sponte,* considered declaring a mistrial, but decided that such a drastic measure was not required under the circumstances. Not only have appellants waived this issue for review, we also find that plain error jurisdiction is not warranted.

## VI.

## Lippman's Redacted Statement

Appellants each raise a concern about the statement that Lippman made to police on October 23, 2001, in which he explained various items that officers recovered from his vehicle, including a gun and over $10,000 in cash. He reported that he kept the gun for protection following the attacks of September 11, 2001, and claimed that Cantine had put the money under his seat.

The court permitted the introduction of the statement with the portion that explicitly referred to Marvin Cantine redacted. In so doing, it aimed to eliminate a *Bruton* problem. In *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the U.S. Supreme Court held that the admission of a non-testifying defendant's pretrial statement implicating a co-defendant by name violated the non-testifying defendant's Sixth Amendment right to confrontation.

### A. Lippman's right to the admission of an "exculpatory" statement.

■ Lippman asserts that the "doctrine of verbal completeness" required the inclusion of the part of the statement that inculpated Cantine, or severance of their trials. Lippman argues that his statement demonstrated that someone else put the money in his car, that the money did not belong to him, and that the jury could infer from these two facts that Lippman was not a part of the heroin conspiracy.

To the degree Lippman's statement was actually exculpatory, its admission in the redacted form did not violate the rule of verbal completeness. It read: "Q: How much money was under the seat? A: I do not know. Q: Why was the money *given* to you? A: To deposit in a bank." (emphasis supplied). In our view the redacted statement conveyed "the substance and context of the statement as a whole." *United States v. Mussaleen,* 35 F.3d 692, 696 (2d Cir.1994). Even truncated, the statement still explained that someone gave Lippman the money, and that it did not belong to him.

## B. Cantine's right to a mistrial.

Cantine asserts that a mistrial was in order when Lippman elicited testimony from Detective Bristol regarding the money found under Lippman's seat. As described above, the court permitted the admission of the redacted statement only. Subsequently, during cross-examination, Lippman referred Detective Bristol to a portion of his grand jury testimony, and the court ultimately instructed the detective, "Read the answer you gave." Detective Bristol responded, "As it was Marv Cantine just cut Lippman loose because Lippman gave the statement that Marvin—that that was Marvin Cantine's money in reference to the seizure at the Marriot Hotel."

 Cantine waited to object until after Detective Bristol read the testimony. We have held that, "if opposing counsel's question is formed improperly or calls for an inadmissible answer, counsel must object immediately. Counsel cannot wait to see whether the answer is favorable before deciding whether to object." *Fowlkes v. State*, 117 Md.App. 573, 587, 701 A.2d 862 (1997) (citation omitted).

Then, Cantine requested a curative instruction and a mistrial. The court denied the motion for a mistrial, but gave a curative instruction. It told the jury that the statement was "not evidence," and that it "should not be considered." It then ordered jurors to "strike" the statement from their notes, and not to "reflect" on it, or "consider" it. The jury is presumed to follow curative instructions. *See Williams v. State*, 131 Md.App. 1, 40, 748 A.2d 1 (2000) (citations omitted).

 When the trial court "has admonished the jury to disregard the [objected to] testimony, it has been . . . consistently held that the trial court has not abused its discretion in refusing to grant a motion for a mistrial." *Wilson v. State*, 261 Md. 551, 568–69, 276 A.2d 214 (1971). Additionally, in *Rainville v. State*, 328 Md. 398, 408, 614 A.2d 949 (1992) (citation omitted), the Court of Appeals identified five factors to consider in determining whether the court has abused its discretion in denying a mistrial:

whether the reference to [the inadmissible evidence] was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; [and] whether a great deal of other evidence exists.

Here, there was a single, isolated statement solicited by Lippman. Additionally, the jury heard a great deal of other evidence, including the wiretapped phone conversations and the direct observation by law enforcement officers, which indicated that Cantine gave Lippman money in furtherance of the conspiracy. In consideration of the court's curative instruction and these factors, we conclude the lower court did not abuse its discretion.

## VII.

### Jury Instructions

In addition to the above complaints, Lippman contends that the trial court erred in refusing to propound two jury instructions, a renunciation charge, and a multiple conspiracies charge. He argues that the evidence warranted each instruction, but we disagree.

In reviewing the trial court's decision not to give the requested instructions, we "must determine whether the requested instruction constitutes a correct statement of the law; whether it is applicable under the facts and circumstances of this case; and whether it has been fairly covered in the instructions given." *Riggins v. State,* 155 Md.App. 181, 223, 843 A.2d 115 (2004) (citations omitted). The second inquiry, whether any evidence in the case supports the instruction, is a question of law. *See id.* at 222, 843 A.2d 115. Our task "is to determine whether the criminal defendant produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application

of the legal theory desired." *Dishman v. State,* 352 Md. 279, 292, 721 A.2d 699 (1998).

 With regard to the renunciation argument, Lippman cites grand jury testimony that Cantine ended Lippman's participation in the conspiracy after his arrest. Certainly, "[i]f a coconspirator unilaterally resigns from an illegal pact involving more than two conspirators, the conspiracy is at an end as to him only." *Irvin v. State,* 23 Md.App. 457, 473, 328 A.2d 329 (1974), *aff'd,* 276 Md. 168, 344 A.2d 418 (1975). Thereafter, the ex-conspirator bears no liability for the subsequent acts of his or her confederates, although the ex-conspirator may remain liable for the original act of conspiring. *See* Comment, MPJI–Cr. § 4:08 (MICPEL 2003).

 To completely escape liability, the Fourth Circuit has concluded that the defendant must act "to defeat or disavow the purposes of the conspiracy." *U.S. v. Urbanik,* 801 F.2d 692, 697 (4th Cir.1986); *see also U.S. v. Geibel,* 369 F.3d 682, 695 (2d Cir.2004); *U.S. v. Jackson,* 345 F.3d 638, 648 (8th Cir.2003); *U.S. v. Brown,* 332 F.3d 363, 374 (6th Cir.2003); *U.S. v. Nieves,* 322 F.3d 51, 55 (1st Cir.2003). "Simply ceasing to participate even for extended periods of time is not sufficient to show withdrawal." *U.S. v. Wren,* 363 F.3d 654, 663 (7th Cir.2004).

Here, although the record provides sparse evidence of Lippman's involvement in the conspiracy after October 23, 2001, there is no evidence of an affirmative withdrawal from the conspiracy. In fact, Lippman made several calls on the night of his arrest, and Detective Bristol interpreted one of these calls to include an order from Cantine to Lippman to clean up the stash house. A subsequent search of Lippman's home in November yielded $120,000, heroin, marijuana, and ammunition. Thus we find no error in the court's refusal to administer a renunciation instruction to the jury.

 Lippman also contends that there were two conspiracies, and that the trial court should have charged the jury accordingly. He points out that Cantine obtained narcotics

from New York, and continued to sell narcotics after police searched Lippman's car in October 2001. However, "a single agreement to engage in criminal activity does not become several conspiracies because it has as its purpose the commission of several offenses." *Mason v. State*, 302 Md. 434, 445, 488 A.2d 955 (1985). That Cantine may have obtained drugs from New York, or sold them after October 23, 2001, did not provide a factual basis for a jury instruction as to the presence of multiple conspiracies.

## VIII.

### Application of the Subsequent Offender Statute

 Lastly, Cantine argues that the lower court both misconstrued the subsequent offender statute and shifted the burden of proof during sentencing.[4] The court applied the statute based upon Cantine's previous incarceration for a violation of a Virginia drug law. Because we determine that the subsequent offender statute explicitly contemplates a violation of Maryland's drug laws only, we reverse the application of the statute to Cantine, and remand for his re-sentencing.

The subsequent offender statute at issue,[5] section 286(d)(1) of Article 27, applies when the offender:

(i) Has served at least 1 term of confinement of at least 180 days in a correctional institution *as a result of a conviction of a previous violation of this section or § 286A of this article; and*

(ii) Has been convicted twice, where the convictions do not arise from a single incident:

---

4. "The court may correct an illegal sentence at any time." Md. Rule 4–345(a). Cantine did not raise, and need not have raised, this issue below to preserve it for our review. *See Webster v. State*, 359 Md. 465, 471, 754 A.2d 1004 (2000).

5. The legislature re-codified this law at Maryland Code (2002, 2003 Supp.), Criminal Law Article, section 5–608(c), but it remains substantively the same.

1. Under subsection (b)(1) or subsection (b)(2) of this section;

2. Of conspiracy to violate subsection (b)(1) or subsection (b)(2) of this section;

3. Of an offense under the laws of another state, the District of Columbia, or the United States that would be a violation of subsection (b)(1) or subsection (b)(2) of this section if committed in this State; or

4. Of any combination of these offenses.

In interpreting this law, our purpose is to effectuate the intention of the legislature. *See Melton v. State,* 379 Md. 471, 476, 842 A.2d 743 (2004) (citation omitted). "If the statutory language is unambiguous when construed according to its ordinary and everyday meaning, then this Court 'will give effect to the statute as it is written,' and we will not add or delete words from the statute." *Id.* at 477, 842 A.2d 743 (citations omitted).

Recently, the Court of Appeals reiterated that the subsequent offender statute "is a highly penal statute that must be interpreted in light of the rule of lenity." *Deville v. State,* 383 Md. 217, 231, 858 A.2d 484 (2004). "[T]he rule of lenity instructs that a court 'not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended.'" *Melgar v. State,* 355 Md. 339, 347, 734 A.2d 712 (1999) (citations omitted). Consequently, we construe any ambiguity of the subsequent offender statute in favor of the accused, and against the State. *Id.* at 351, 734 A.2d 712.

The plain language of the subsequent offender statute explicitly limits predicate offenses in subpart (i) to "a previous violation of this section or § 286A of this article." In contrast, subpart (ii) specifically includes violations of "laws of another state, the District of Columbia, or the United States that would be a violation of subsection (b)(1) or subsection (b)(2) of this section if committed in this State."

When the legislature re-codified section 286(d) in 2002, it retained the jurisdictional specifications of each subpart. Indeed, the new law reiterates that in subpart (i), the predicate incarceration must have resulted from "a conviction under subsection (a) of this section, § 5–609 of this subtitle, or § 5–614 of this subtitle," and that in subpart (ii), the two other predicate offenses could have resulted from violations "under the laws of another state or the United States that would be a crime included in subsection (a) of this section or § 5–609 of this subtitle if committed in this State." Md. Code (2002, 2003 Supp.), Crim. Law § 5–608(c)(1)(i)–(ii). Had the legislature intended to include periods of incarceration arising from the violations of drug laws in other States in subpart (i), it easily could have, as it did in subpart (ii). Following the interpretive doctrine of *expressio unius est exclusio alterius*,[6] the statute's explicit reference to its own laws excludes the interpretation that it included the laws of other jurisdictions, as well. "We cannot assume authority to read into the Act what the Legislature apparently deliberately left out." *Price v. State*, 378 Md. 378, 388, 835 A.2d 1221 (citation omitted).

We find instructive *Melgar*, 355 Md. 339, 734 A.2d 712. There, the Court of Appeals also examined subpart (i) of section 286(d)(1) to determine that time served in pretrial detention did not count toward the 180–day period of prior confinement. In reaching its decision, the Court of Appeals noted that "one of the goals of enhanced punishment statutes [was] to identify and punish severely those offenders who 'had been accorded a fair chance at rehabilitation in the prison system and had not responded.' " *Id.* at 351, 734 A.2d 712 (citation omitted). The Court concluded that "the public policy goal of affording criminal offenders a meaningful chance at rehabilitation before subjecting them to mandatory, enhanced penalties ... underscore the purposefulness of the Legislature's choice of the phrase 'as a result of conviction.' " *Id.*

---

6. The expression of one thing is the exclusion of another.

Similarly, the legislature explicitly specified that the 180–day period of incarceration must result from a "violation of *this* section or § 286A of *this* article." (Emphasis added). Because Maryland pursues a progressive approach for managing drug offenders, it would be reasonable to conclude that the legislature purposefully drew a distinction between serving time in a Maryland-approved facility for a violation of Maryland law, and serving time in another facility for the violation of a law in another jurisdiction. When the offender has not had the opportunity to benefit from Maryland's correctional system, the plain language of the statute indicates the legislature's desire not "to throw away the key."

 Lastly, and without inferring any error by the trial court, we briefly address Cantine's contention about the burden of proof, because it may resurface at re-sentencing. In short, the State bears the burden of proving beyond a reasonable doubt all statutory prerequisites for the application of an enhanced sentence. *See Melgar,* 355 Md. at 348, 734 A.2d 712; *see also Jones v. State,* 324 Md. 32, 37, 595 A.2d 463 (1991).

**SENTENCE OF MARVIN CANTINE VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR RE–SENTENCING; ALL OTHER JUDGMENTS AFFIRMED.**

**APPELLANTS TO PAY 7/8 OF THE COSTS; THE MAYOR AND CITY COUNCIL OF BALTIMORE CITY TO PAY 1/8 OF THE COSTS.**